Argued December 17, 1895; decided March 2, 1896.

## STATE *v.* STEEVES.
[43 Pac. 947.]

1. SUFFICIENCY OF INDICTMENT.— On appeal from a conviction for manslaughter in a trial for murder defendant cannot object to the indictment as insufficient to charge murder.

2. CONSTITUTION, ART. I, § 11 — INDICTMENT OF ACCESSORY — CODE, § 2011.— The provision of section 2011, Hill's Code, abrogating the distinction between an accessory before the fact and the principal in cases of felony, and providing that all persons concerned in the commission of a felony who aid or abet in its commission shall be indicted, tried, and punished as principals, does not violate article I, section 11, of the state constitution, guaranteeing to the accused the right to demand the nature and cause of the accusation against him.

3. OPINION OF JUROR — PEREMPTORY CHALLENGE.— One jointly indicted for murder, on the theory that he was an accessory before the fact with the alleged principal, who has been found guilty on a separate trial, is entitled to ask the jurors whether they have formed or expressed an opinion as to the guilt of such principal, in order to enable him to properly exercise his right of peremptory challenge.

| | |
|---|---|
| 29 | 85 |
| a32 | 191 |
| 29 | 85 |
| 33 | 96 |
| f33 | 115 |
| f33 | 237 |
| f33 | 540 |
| 29 | 85 |
| 36 | 204 |
| 29 | 85 |
| 37 | 89 |
| 29 | 85 |
| 39 | 78 |
| f39 | 176 |
| 29 | 85 |
| 48 | 489 |

4. WAIVER OF OBJECTION TO WITNESS.— An objection that a codefendant is not a competent witness is waived unless made at the trial,— it cannot be urged for the first time on appeal.

5. FOUNDATION FOR IMPEACHMENT OF WITNESSES—CODE, § 841.—A witness cannot be interrogated, under section 841 of Hill's Code, concerning oral statements made by him for the purpose of being written down, and which are reduced to writing, without first showing the writing to him.

6. CONSTITUTION, ART. I, § 11 — WITNESSES — EVIDENCE.—A written statement by one of two persons jointly indicted cannot be introduced in evidence against the other defendant at his separate trial under article I, section 11, of the Oregon Constitution, entitling an accused to meet the witnesses face to face.

7. LIMITATION OF RIGHT TO IMPEACH ONE'S OWN WITNESS*— CODE, §§ 838, 841.—Under the provisions of section 838, Hill's Code, a party who calls a witness, and is surprised by his unexpected and unfavorable testimony on a material point, may, for the purpose of refreshing his recollection, and inducing him to correct his testimony or explain his apparent inconsistency, repeat to such witness, with the circumstances of time, place, and persons present, as required by section 841 of Hill's Code, declarations and statements previously made by him, which are inconsistent with his present sworn testimony, and he may be asked whether he made them. If the witness denies or does not remember having made the statements, the party who called him may then offer testimony thereof to excuse his mistake in calling him, and to destroy the effect of any adverse testimony he may have given. Care must be taken, however, that such statements are not allowed to go to the jury as substantiative evidence —they should be carefully limited to purposes of excuse and explanation: *State* v. *Fitzhugh,* 2 Or. 227, *Langford* v. *Jones,* 18 Or. 307; *Josephi* v. *Furnish,* 27 Or. 266, approved and followed.

8. IMPEACHMENT OF WITNESSES BY CONFESSION.— While under some circumstances a party may contradict the testimony of his own witness, he certainly cannot do so by statements contained in an involuntary confession made by such witness.

9. CRIMINAL LAW— EFFECT OF VERDICT— JEOPARDY.—A conviction of a lower degree of a crime than the one charged in an indictment (where the lower degrees are within the higher one) is an acquittal of all the higher degrees, and, in the absence of a statute, the accused cannot after reversal be retried for any degree of the crime higher than the one of which he was convicted.

*A valuable collection of authorities on the right of a party to discredit or contradict his own witness will be found with the Ohio case of *Hurley* v. *State,* 4 L. R. A. 161. See also *Selover* v. *Bryant,* 40 Am. St. Rep. 353. —REPORTER.

10. PRINCIPAL AND ACCESSORY.— A principal may be convicted of murder in the second degree and an accessory before the fact of manslaughter.

APPEAL from Multnomah: T. A. STEPHENS, Judge.

The defendant X. N. Steeves was jointly indicted with one Joseph Kelly for the crime of murder in the first degree, alleged to have been committed in the killing of one George W. Sayres. They had separate trials. Kelly having been first tried, was convicted of murder in the second degree, (*State* v. *Kelly*, 28 Or. 225, 42 Pac. 217,) and the defendant of manslaughter, and, being sentenced to imprisonment in the penitentiary for the term of fifteen years, and to pay a fine of one thousand dollars, he appeals, assigning numerous errors, a few of which we will consider.                    REVERSED.

For appellant there was a brief and an oral argument by *Mr. Rufus Mallory.*

For respondent there was a brief by *Mr. Wilson T. Hume,* district attorney, with oral arguments by *Messrs. Hume* and *Cicero M. Idleman,* attorney - general.

Opinion by MR. JUSTICE MOORE.

1. It is contended that the indictment does not charge murder in any degree, but this cannot avail the defendant, for, having been convicted of manslaughter only, he can have no valid reason to question the sufficiency of the indictment for a failure to allege murder in either degree. The principle

for which he contends implies that the facts constituting the crime of manslaughter are properly stated, and, having been convicted thereof, it is manifest that the indictment is sufficient to support the judgment.

2.  The defendant's counsel, after the state had introduced its evidence and rested, moved the court to direct the jury to return a verdict of acquittal on the ground, *inter alia*, that the indictment did not charge the defendant with the commission of the alleged crime for ·which he had been tried. The motion having been overruled, and an exception allowed, it is insisted that the court erred in its refusal to · so direct. It was not claimed at the trial that the defendant was present at the killing of Sayres, but it was insisted by the state, and the evidence introduced by it was in support of the theory, that Steeves counseled and procured Kelly to kill the deceased. The indictment charged the defendant with the commission of the overt act, and it is claimed that instead thereof he should have been charged as an accessory before the fact, and that to charge him as a principal violated the provision of the constitution which guarantees to the accused the right to demand the nature and cause of the accusation against him: Constitution of Oregon, Art. I, § 11. The statute having prescribed that the indictment must contain a statement of the acts constituting the offense in ordinary and concise language, without repetition, in such a manner as to enable a person of common understanding to know

what is intended, (section 1268, Hill's Code,) it is
also claimed that the defendant could not know from
an inspection of the charge that an attempt would
be made to prove that he was an accessory before
the fact, and that his right to be so informed was
guaranteed by the organic law of the state. At the
common law all persons who participated in any
manner in the commission of high treason or mis-
demeanor were treated as principals, but accessories
before and after the fact were recognized in the
commission of felonies: 4 Blackstone's Commenta-
ries, 35. Principals and accessories were punished
alike by the general rule of the ancient law, but
Blackstone says the difference between these classes
of offenders was observed "that the accused may
know how to defend himself when indicted": 4 Black-
stone's Commentaries, 39. The accessory could not
be arraigned until after the attainder of the princi-
pal, unless he chose it, for he might waive the ben-
efit of the law, and be tried with the principal:
4 Blackstone's Commentaries, 323. Those who would
be accessories after the fact in felony would in
treason be regarded as principals, but they were
nevertheless treated in every particular as acces-
sories; the charge in the indictment against them
had to specify the accessorial nature of the offense,
and they could not be convicted in advance of the
principal: (1 Bishop on Criminal Law, § 701); and
those who in felony would be treated as accessories
before the fact would in treason be also regarded
as principals, but they might be directly charged
with having done the overt act, or with having

performed it through the agency of another: 1 Bishop on Criminal Law, § 682. "The legal distinction between the accessory before the fact and the principal," says Mr. Bishop, "rests solely on authority; for it is without foundation either in reason or the ordinary doctrines of the law. The general rule in our jurisprudence, civil and criminal, is that what one does through another's agency he does in point of law himself": Bishop on Criminal Law, § 673.

Our statute has amended the rules of the common law upon this subject, and now treats all persons concerned in the commission of a crime as principals (section 2011, Hill's Code); and also provides that "The distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated, and all persons concerned in the commission of a felony, whether they directly commit the act constituting the crime, or aid and abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of a misdemeanor:" Code, § 1289. The defendant's contention proceeds upon the theory that the section just quoted violates the provision of the constitution which guarantees to the accused the right to demand the nature and cause of the accusation against him. In support of the principle contended for, our attention has been called to the case of *People* v. *Campbell,* 40 Cal. 129, in which CROCKETT, J., says: "The accessory is to be indicted, tried, and punished as a principal; nevertheless, the particular

acts which establish that he aided and abetted the
crime, and thus became, in law, a principal, must be
stated in the indictment. When these facts are
averred and proved, the law considers the accused
to be a principal, and condemns him accordingly."
But in *People* v. *Outeveras*, 48 Cal. 19, the court,
reviewing the principle announced in the preceding
case, held that, the statute having abrogated the
distinction between a principal and an accessory,
each might be indicted, tried, convicted and pun-
ished as a principal, thus reversing one of the cases
upon the authority of which the defendant relies.
This doctrine was reaffirmed in *People* v. *Rozelle*, 78
Cal. 84 (20 Pac. 36), but in these cases the defendants
were present, aiding and abetting in the commission
of the respective crimes with which they were
charged, and at common law would have been de-
nominated principles of the second degree: 1 Bishop
on Criminal Law, § 648. So too in *State* v. *Moran*,
15 Or. 262 (14 Pac. 419), it was held that under the
statute abrogating the distinction between principles
and accessories, any person concerned in the com-
mission of the crime is a principal, and he is to be
charged as such whether he directly committed the
act or not, and all evidence tending to prove his
complicity is admissible under that form of the in-
dictment. In that case it was admitted that Moran
was an accomplice in the administering of morphine
which caused the death of one Frederick Kaluscha.
To the person who is present, aiding and abetting
another in the commission of a crime, the abroga-
tion of the distinction between principals and acces-

sories can have no application: *State* v. *Fitzhugh*, 2 Or. 227; *State* v. *Kirk*, 10 Or. 505. It has been held that a statute prescribing the form of the indictment which does not inform the accused of the nature and cause of the accusation against him was violative of the organic law of a state which guaranteed such a right: *McLaughlin* v. *State*, 45 Ind. 338; *People* v. *Olmstead*, 30 Mich. 432. In *State* v. *O'Flaherty*, 7 Nev. 153, it was held that the power of the legislature to mold and fashion the form of an indictment is plenary, but a statement in some form of essential and material facts cannot be dispensed with; and to the same effect is *Brown* v. *People*, 29 Mich. 232. In *State* v. *Duncan*, 7 Wash. 336 (38 Am. St. Rep. 888, 35 Pac. 117), the Supreme Court of Washington, under a constitution containing a clause identical with ours, (section 22, article I, Constitution of Washington), held that an accessory before the fact may be charged in the information with the commission of the crime as a principal; but no reference is made by the court to that section of the constitution.

As we have seen there exists no valid reason for the distinction between an accessory before the fact and a principal. How, then, can it be said that the statute abrogating the distinction between these classes of offenders violates the organic law of the state? When the accessory before the fact is charged with the commission of the overt act, he is thereby substantially informed of "the nature and cause of the accusation against him." The person who counsels or procures another to commit a crime is by

the statute properly deemed and considered as a
principal, for in civil proceedings the maxim *Qui
facit per alium facit per se* is applied to the relations
of principal and agent; and since the rule of the
common law has been changed requiring the state
to establish the guilt of the accused beyond a reason-
able doubt, instead of requiring him to prove his
innocence, there is no just reason why the same
maxim should not now be invoked in criminal pro-
cedure; and, the overt act having been performed
by him through his agent, the constitution, in our
judgment, is not violated when the accessory before
the fact is charged directly with having committed
the crime. It is the intent of him that counsels or
procures another to violate the law, coupled with the
intent and act of the person who in pursuance
thereof executes the original design, that constitutes
the commission of the crime by the accessory before
the fact. No crime is committed until the agent ex-
ecutes the orders of his principal, and the criminal
responsibility of him who procured the act to be
performed depends upon its performance by the
agent. The most potent objection urged against an
indictment charging an accessory before the fact
with the commission of the overt act is that the
accused, being innocent, may have prepared for trial
upon the expectation that evidence would be intro-
duced tending to support the charge as laid, and
might not know anything to the contrary until the
jury had been impaneled, and then be surprised by
learning from the statement made by the prosecut-
ing attorney the real nature of the accusation. The

statute having treated the accessory before the fact as a principal, he may be tried before, with, or after the person who actually committed the overt act; but, his connection therewith being dependent upon the commission of the crime by his agent, the guilt of the latter must of necessity be an issue at the trial of the former, which would entitle him of right to have a jury unprejudiced. There was not, in our judgment, such a variance between the charge in the indictment and the evidence introduced at the trial as would have warranted the court in ordering a verdict of acquittal.

3. The defendant's counsel, anticipating that the state would pursue the theory which it adopted, that Steeves was an accessory before the fact, and had advised and procured his codefendant to kill Sayres, propounded to each juror on his *voir dire* the following question: "From what you have heard or read have you formed or expressed an opinion as to the guilt of Joseph Kelly, indicted with Steeves?" The court sustained an objection to the question, and refused to permit the jurors to answer it until after the defendant had exhausted his peremptory challenges. An exception to this ruling having been saved, it is contended that the defendant had the legal right to ask the question, and to ascertain from the juror's answer thereto the state of his mind as to Kelly's guilt, notwithstanding his right to peremptorily challenge him. The theory pursued by the state assumed that there was an agreement between Steeves and Kelly to take the life of Sayres. But

no crime could be committed by Steeves until Kelly, in pursuance of the supposed agreement, committed some overt act in the performance of the conspiracy. It is true that Kelly, though jointly indicted with Steeves, had been separately tried and convicted, but, the crime with which he was charged being in its nature several, the record of his conviction could not be offered in evidence to establish the guilt of Steeves, (*State* v. *Bowker*, 26 Or. 309, 38 Pac. 124,) who, not having been tried with Kelly, was not a party to or bound by the judgment in that case; and it was incumbent upon the state to establish the guilt of Kelly, as well as the advice and procurement of Steeves: *Ogden* v. *State*, 12 Wis. 592 (78 Am. Dec. 754). Steeves' plea to the indictment, therefore, put in issue the overt act of Kelly as well as the alleged conspiracy, and the jury called to try the issue must have first determined that Kelly committed the crime before they could find Steeves guilty. The right to interrogate the jurors in relation to any opinion they might have formed concerning the issues involved must be conceded; but the mere fact of having formed or expressed a qualified opinion upon the merits of any question directly or collaterally in issue would not of necessity render them ineligible to try the facts, if, in the discretion of the court, it should find them, upon examination, otherwise competent: *State* v. *Saunders*, 14 Or. 300 (12 Pac. 441); *Kumli* v. *Southern Pacific Company*, 21 Or. 505 (28 Pac. 637); *State* v. *Ingram*, 23 Or. 434 (31 Pac. 1049); *State* v. *Brown*, 28 Or. 147 (41 Pac. 1042); *State* v. *Kelly*, 28 Or. 225 (42 Pac. 217). This discretion

could be exercised only by a trial of the qualifications of a juror, and from his answers to the questions, as well as from his manner, tone, and bearing. The court must be satisfied that he can disregard any casual opinion he may have formed, and fairly and impartially try the issues in controversy. When the qualifications of a juror have thus been tried, no bill of exceptions can portray the manner, tone, and bearing of the juror as he appeared and acted before the trial court during the examination; and for this reason, when the juror has said he can lay aside his previously formed opinion, and the court believes he can do so, its discretion, when exercised, will not be reviewed upon appeal except for a manifest abuse thereof.

But it is not to be expected that the manner, tone, or appearance of the juror, without an oral examination as to the state of his mind upon the merits of the issue involved, are alone sufficient to determine his qualifications. The statute has wisely granted to the defendant in a criminal action the right to a certain number of peremptory challenges, which he may exercise without assigning any reason therefor; and to enable him to do so intelligently he is entitled of right to inquire into the fitness of persons called as jurors to try him, and in many instances he can determine when to wisely exercise this right only from their examination. In *Hale* v. *State*, 72 Miss. 140, (16 So. 387,) the accused was jointly indicted with one J. G. Robertson for the crime of murder. A separate trial having been granted, the state adopted the theory that the homi-

cide was committed in pursuance of a conspiracy entered into between the defendant and Robertson. The accused, when the jury was being impaneled, propounded questions to the persons called concerning any opinion they might have formed as to the guilt or innocence of Robertson, but the court refused to permit them to answer. The defendant having been convicted appealed, and the supreme court of Mississippi, in reversing the judgment and commenting on the defendant's right to propound the questions, say: "It was his right to make such examination as would enable him to decide if there was ground for exercising his great right to peremptorily challenge. This right, conferred upon him by law, could only be intelligently exercised after a full and fair inquiry of each juror as to the exact state of his mind and feelings, not only as affecting the defendant personally and primarily, but as likely to affect his action as a juror even, and perhaps unconsciously to himself. The office of the peremptory challenge is to protect the defendant against those legally competent, but morally, or otherwise, unfit or unsuitable to try the particular case; and to deny a full and fair examination of a juror in order to wisely exercise the peremptory challenge, would be, practically, to nullify the right, for of what avail would a peremptory challenge be if exercised at random or blindly, and without reason? The right to peremptory challenge is the last precious safeguard of a fair trial left to one capitally charged, before he puts life and liberty in the keep-

29 OR.— 7.

ing of his sworn triers." The previous trial and
conviction of Kelly was liable to create in the minds
of the jurors an opinion as to the guilt or innocence
of his codefendant, and, as Kelly's guilt was in issue
in this case, Steeves was entitled to have the ques-
tion answered by the jurors, and a denial of this
right was error in the trial court.

4. Steeves' codefendant, being called as a wit-
ness for the state, testified that his name was
Joseph Kelly; that he was indicted, but did not
know whether jointly with Steeves or not; that he
had been tried and convicted; that he did not know
where he was on the night of September twenty-
sixth, eighteen hundred and ninety-four, between
the hours of nine o'clock and half-past eleven; and
that he knew where the engine-house was in Fulton
Park; when the following question was asked: "Did
you have any arrangement with X. N. Steeves for
the payment of any money to you for service to be
performed by you in getting George Sayres out of
the way?" To which he answered, "No." The pros-
ecuting attorney was then permitted, over the de-
fendant's objection, to lay the foundation for im-
peaching the witness, and he was asked if he had
not stated, at a time and place and in the presence
of certain persons designated, that he saw Steeves
several times, who urged him to do the work, and
told him there was two thousand dollars to get
Sayres out of the way. The counsel for the defend-
ant thereupon submitted to the court a written
objection to the question, which, in substance, pur-

ported to detail the circumstances under which the witness had made an alleged confession; that it was not voluntarily made, and for that reason was not received in evidence at the time he was on trial under this indictment; that the alleged statements were orally made to the district attorney in the presence of the chief of police and other officers, and, being then reduced to writing, were signed by Kelly; that the writing was in existence, and then in the possession of the district attorney; and if the witness could be examined at all concerning the matter, the writing should be exhibited to him, and he be allowed to examine it. The district attorney also submitted a written answer controverting the averments contained in the preceding statement, and the court overruled the objection, and required the witness to answer the question, which he did by saying "I don't recollect anything at all about it," and also gave testimony tending to corroborate the statements contained in the written objection submitted by the defendant's counsel. The following question was then propounded to the witness: "Did you receive any money from Steeves? Did he pay you any money after the twenty-sixth day of September of this year?" To which he answered: "Steeves never paid me any money in his life." The witness was then asked if he had not said, at the time and place and under the circumstances named, "I got one hundred dollars from Steeves at his office on Thursday morning after Sayres disappeared, and I got one hundred dollars on Monday, October first, from Steeves, and twenty dollars on two

other occasions," or words to that effect. To which
he answered: "No; I don't recollect anything about
it." John Minto, chief of police, being called as a
witness for the state, testified, in substance, that
whatever Kelly had said in the interview to which
his attention had been called, had been written
down by the district attorney and signed by Kelly;
that he said to Kelly, "Don't you sign that state-
ment unless it is true"; that the district attorney
made the same statement to Kelly and also said to
him: "If that statement is true and you tell the
truth, so far as I am concerned I am willing to use
my influence towards saving your neck," or words to
that effect. Objection having been made to the wit-
ness detailing any confession made by Kelly, the
court held that only such statements as were volun-
tarily made by Kelly, and admitted against him at
his own trial, were admissible in this case. The
chief of police was then, over the defendant's objec-
tion and exception, permitted to testify concerning
the said alleged confession, and corroborated the
statements contained in the questions propounded to
Kelly.

It is contended that the court erred in permitting
the chief of police to testify concerning any state-
ments made by Kelly in relation to the commission
of the crime, or of the alleged conspiracy, for the
following reasons: *First*, that Kelly was a codefend-
ant, and hence an incompetent witness; *second*, that
the alleged statements, although reduced to writing
and signed by Kelly, were not shown to him when
the foundation was being laid for their admission;

*third*, that the statements were made by Kelly while under duress, and could not be offered in evidence; and, *fourth*, that Kelly, having given no testimony against the ·state, could not be impeached by it. In considering these questions it is sufficient to say of the first objection that no exceptions to the competency of Kelly as a witness were taken at the trial. This being so, it must be presumed that the error, if any, was waived.

5.   It is admitted that the court at the trial of Kelly on this indictment refused to permit his alleged statements to be given in evidence, for the reason that they had not been voluntarily made, and that they were admitted in this case for the purpose of contradicting Kelly only. It is manifest that these statements were made in the presence of the chief of police and others, and, being reduced to writing, were signed by Kelly, but they were not shown to him before he was interrogated concerning them, as required by the provisions of section 841, Hill's Code of Oregon. The reason assigned for not showing the writing to Kelly when called as a witness, as we gather it from the record, is that the statements were orally made by him to others before being reduced to writing, and therefore it was unnecessary to exhibit it to him. Kelly made the alleged confession for the purpose of having it written by the district attorney, and the statements therein contained must have been orally made before being written; but when he signed the confession he adopted the language there used, and made it his

own as much so as if he had personally written it. This being so, by what authority could Kelly be interrogated as to the contents of the writing until it was shown to him? The object sought by the statutory requirement, as we view it, is to refresh the memory of the witness, and, his statements being in writing, that end could be best attained by submitting the manuscript to him for inspection. The fact that the statements were made in the presence of others before being written cannot change this rule, otherwise the writing could be wholly disregarded, and evidence of the oral statements as remembered by the persons who heard them could be substituted therefor. Oral statements intended to be reduced to writing, when committed to paper and signed by the person making them, are supplanted, and must of necessity be excluded, by the writing, and, even if the writing in this case could have been admitted for any purpose, it was error to interrogate Kelly concerning the statements therein without having first shown it to him: *People* v. *Nonella*, 99 Cal. 333 (33 Pac. 1097); *People* v. *Ching Hing Chang*, 74 Cal. 389 (16 Pac. 201).

6. The statements not having been voluntarily made were excluded at Kelly's trial; but, even if they had been admissible against him, having been reduced to writing, they could not be introduced in evidence at the trial of his codefendant, who was entitled to meet the witnesses face to face: Constitution of Oregon, Art. I, § 11. The reason assigned by the trial court for admitting them was to contra-

dict Kelly, but we shall attempt to show that they were inadmissible for that purpose.

7. When a party producing a witness calls him to the stand he thereby represents him to the court as worthy of credit, or at least not so infamous as to be wholly unworthy of it; and is precluded from attacking his general character for veracity (1 Wharton on Law of Evidence, § 549); but he may be grievously disappointed in the testimony given by him, for, perhaps being in collusion with the adverse party, the witness may have led the party calling him into the belief that the testimony expected would be advantageous to the cause of such party; and if there were no method of correcting such mistakes a party would be at the mercy of a designing witness, but our statute has wisely provided that, while a party producing a witness is not allowed to impeach his credit by evidence of bad character, he may contradict him by other evidence, and may also show he has made at other times statements inconsistent with his present testimony: Hill's Code, § 838. This section furnishes a means of correcting the mistake in calling the witness and neutralizing the effect of his adverse testimony, by permitting the party to treat the witness as adverse, and to propound leading questions to him for the purpose of refreshing his memory; and, if he still persists in adhering to what he has said, such party may impeach him by evidence that he made at other times statements inconsistent with his present testimony. Before this can be done, however, the statements

must be related to him, with the circumstances of times, places, and persons present, or shown to him if in writing; and he shall be asked whether he made such statements, and if so, allowed to explain them: Code, § 841. If the witness denies or claims that he cannot remember having made the statements attributed to him, the party producing him may then offer evidence thereof to excuse his mistake in calling him, and to destroy the effect of any adverse testimony he may have given. This is as far as the rule can be legitimately carried, and courts should carefully guard against its abuse by the party producing the witness, for, if the statements made by him could be admitted in evidence in support of the cause of the party calling him, a witness in league with such party might make statements out of court, and not under oath, which he knew were false, and, being called as a witness, could truthfully testify concerning the facts in issue and against the party calling him; and, upon his denying that he made the statements attributed to him, or claiming that he failed to remember of having made them, evidence thereof could be introduced, not for the purpose of excusing the mistake made in calling the witness, or to correct the effect of the adverse testimony, but as substantive evidence in support of the cause of the party calling him, thus permitting a party to do by indirection what he could not do directly: State v. Fitzhugh, 2 Or. 277; Langford v. Jones, 18 Or. 307 (22 Pac. 1064). The rule appears to be well settled that a party cannot impeach his own witness by showing

he has made statements inconsistent with the testimony given at the trial, unless the testimony so given be material and prejudicial to the interests of the party calling him: *Champ* v. *Commonwealth,* 2 Metc. (Ky.) 17 (74 Am. Dec. 388); *Hull* v. *State,* 93 Ind. 128; *Moore* v. *Chicago Railroad Company,* 59 Miss. 243; *Force* v. *Martin,* 122 Mass. 5; *Hickory* v. *United States,* 151 U. S. 203 (14 Sup. Ct. 334); *Erwin* v. *State* (Texas Crim. App.), 24 S. W. 904; *Bennett* v. *State* (Texas App.), 5 S. W. 527; *Miller* v. *Cook,* 124 Ind. 101 (24 N. E. 577); *Commonwealth* v. *Welsh,* 4 Gray, 535; *Chism* v. *State,* 70 Miss. 242 (12 So. 852); *Smith* v. *State,* 5 Neb. 181; *Josephi* v. *Furnish,* 27 Or. 260 (41 Pac. 424); *People* v. *Jacobs,* 49 Cal. 384; *People* v. *Mitchell,* 94 Cal. 550 (29 Pac. 1106); *Burkhalter* v. *Edwards,* 16 Ga. 593 (60 Am. Dec. 744); *Hurley* v. *State,* (46 Ohio St. 320, 4 L. R. A. 171, 21 N. E. 645); *Rhodes* v. *State,* 128 Ind. 189 (25 Am. St. Rep. 425, 27 N. E. 866); *Langford* v. *Jones,* 18 Or. 307 (22 Pac. 1064).

8. Looking at the evidence in the light of this rule, it shows that the state had not proven that Steeves paid or promised money to Kelly for any purpose. It is true, the evidence introduced by it tended to show that on the day of the homicide Kelly had no money, but on the day thereafter he paid out about eighty dollars, and that Steeves on the day last named drew from the bank one hundred dollars; but it cannot be inferred from these circumstances that the money drawn from the bank by Steeves was paid or given to Kelly, or that the money

expended by Kelly on the day after Sayres disappeared was not legitimately acquired. If Kelly had sworn to the fact which he was called to prove, his testimony would have been material for the state and against the defendant; but as it was only a denial it may well be doubted if such testimony can be considered in any other light than a failure to prove a relevant fact. When Kelly testified that Steeves never paid him any money in his life, his testimony did not contradict any evidence introduced by the state. It may have tended to refute the theory adopted by it, and in that respect, if it be conceded that his evidence was material and prejudicial, Kelly could not be contradicted unless his statements had been voluntarily made. When he was on trial, the court, deeming his statements not to have been so made, refused to permit them to be offered in evidence, and this being so, how could he be contradicted by them? If Kelly, through fear of personal violence, or the hope of saving his life thereby, made the confession attributed to him, the court could not do otherwise than exclude it. Had the confession been extorted by fear, would any one contend that Kelly should have been bound by it? Assent to a contract executed under such circumstances would not be a meeting of the minds, but a submission to superior force, and no court would enforce its terms. Such is the rule even in civil actions, but it is of vastly more importance in criminal proceedings. If such a rule could be invoked, it would be an illustration of the familiar statement that "history repeats itself," and would in effect be a revival of the methods of tor-

ture resorted to in times long past as a means of securing evidence with which to convict persons charged with the commission of crime. Kelly's confession not having been voluntarily made, the court erred in permitting the foundation to be laid for his impeachment, and in allowing the chief of police to testify concerning any of his alleged statements.

9. It is contended that, the defendant having been indicted for the crime of murder in the first degree, and being convicted of manslaughter only, the verdict of the jury, though general in its terms, was an acquittal of the charge of murder in the first and second degrees, and that, in case the judgment rendered against him be reversed, he cannot be retried upon the charges of which he has been acquitted. The state constitution, article I, section 12, provides that "No person shall be put in jeopardy twice for the same offense." The defendant having been arraigned, entered a plea of not guilty to the indictment, and the moment the jury was sworn to try him jeopardy attached, and, had the jury been discharged without his consent, except upon a failure to agree upon a verdict, he would stand acquitted before the law: *Conkling* v. *State*, 25 Neb. 794 (41 N. W. 788); *Murphy* v. *State*, 25 Mo. 809 (41 N. W. 792); *State* v. *Shaffer*, 23 Or. 255 (32 Pac. 545); *State* v. *Reinhart*, 26 Or. 466 (38 Pac. 822). The defendent having, therefore, been put in jeopardy for the crime of murder in the first and second degrees, his conviction for manslaughter, while unreversed, is a bar to another prosecution for all

other degrees embraced within the indictment:
Section 1339, Hill's Code. It remains to be seen
whether the granting of a new trial places the de-
fendant in *statu quo*, and removes the bar created
by the arraignment, plea, and verdict. Mr. Van
Fleet, in his excellent work on Former Adjudication
(Vol. II, § 606) in discussing this question says: "If
one is tried upon an indictment which either ex-
pressly charges or impliedly includes different de-
grees of the same crime, it is held, as a common-
law question, in Alabama, Arkansas, California, Flor-
ida, Georgia, Illinois, Iowa, Michigan, Mississippi,
Texas, and Wisconsin, that a conviction of one de-
gree is an implied acquittal of all higher degrees,
and bars their prosecution upon a new trial." In
*Hurt* v. *State*, 25 Miss. 358 (59 Am. Dec. 225), FISHER,
J., in speaking of the effect of a verdict of convic-
tion of an inferior degree, says: "The jury in such
case, in contemplation of law, render two verdicts,
one acquitting the accused of the higher crime
charged in the indictment, the other finding him
guilty of an inferior crime. They must first deter-
mine his guilt or innocence upon the charge made
by the indictment before proceeding to consider
whether he is guilty of an inferior crime. The ver-
dict of manslaughter is as much an acquittal of the
charge of murder as a verdict pronouncing his en-
tire innocence would be, for the effect of both is to
exempt him from the penalty of the law for such
crime." The statute provides that "In all cases, the
defendant may be found guilty of any crime, the
commission of which is necessarily included in that

with which he is charged in the indictment, or of an attempt to commit such crime": Section 1383, Hill's Code. The effect of this section is to regard each degree necessarily embraced within the specifications of the charge as a separate indictment, upon all which the accused is tried at the same time, and the verdict of conviction upon an inferior degree operates as an acquittal of all the superior degress necessarily included therein. In Indiana, Kansas, and Kentucky statutes provide that "the granting of a new trial places the parties in the same position as if no trial had been had," and in those states it has been held that one who has been convicted of manslaughter upon an indictment that charges the crime of murder, and obtained a new trial, may be retried for the higher degree: *Ex parte Bradley*, 48 Ind. 548; *Veatch* v. *State*, 60 Ind. 291; *State* v. *McCord*, 8 Kan. 232 (12 Am. Rep. 469); *Commonwealth* v. *Arnold*, 83 Ky. 1 (4 Am. St. Rep. 114).

·Prior to the amendment of the constitution of Missouri, the supreme court of that state uniformly held that 'when a new trial was granted to a person convicted of an inferior degree upon an indictment charging the commission of a crime in a superior degree he could not be retried for the higher degree: *State* v. *Ross*, 29 Mo. 32; *State* v. *Kattlemann*, 35 Mo. 105; *State* v. *Smith*, 53 Mo. 139; *State* v. *Brannon*, 55 Mo. 63 (17 Am. Rep. 643); *State* v. *Bruffey*, 75 Mo. 389. On November thirtieth, eighteen hundred and seventy-five, that state adopted a new constitution, which contained the provision (section 23, article II,) that "if judgment on a verdict of guilty be

reversed for error in law, nothing contained herein shall prevent a new trial of the prisoner on a proper indictment, or according to the correct principles of law." In *State* v. *Simms*, 71 Mo. 538, it was held that this provision overturned the rule announced in *State* v. *Ross*, 29 Mo. 32, the court saying it was "equivalent to declaring that when such judgment is reversed for error at law, the trial had is to be regarded as a mistrial, and that the cause, when remanded, is to be tried anew, and is put on the same footing as to a new trial as if the cause had been submitted to a jury, resulting in a mistrial by the discharge of the jury in consequence of their inability to agree on a verdict." Our statute prescribes that "A new trial is a reëxamination of an issue of fact in the same court after a trial and decision or verdict by a court or jury," (section 234, Hill's Code,) but it is nowhere provided that the granting of a new trial places the parties in the same position as if no trial had been had. "One indicted for murder," says Mr. Bishop in his work on Criminal Law (7th ed.), Vol. I, § 1056, "and found guilty of manslaughter, is protected from any further prosecution for the murder." And in the succeeding section the same learned author, in discussing the effect of a conviction of a smaller grade included in an indictment charging a greater crime, says: "Besides, as a larger includes a smaller, it is impossible one should be convicted of the larger without being also convicted of the smaller; and thus, if he has been found guilty or not guilty of the smaller, he is, when on trial for the larger, in jeopardy a second

time for the same, namely, the smaller offense. Some apparent authority, therefore, English and American, that a jeopardy for the less will not bar an indictment for the greater, must be deemed unsound in principle." While there is some conflict of authority upon this subject, we believe that the great weight of it, as well as the better reason, supports the rule that a conviction of a lower degree necessarily included within an indictment charging the commission of a greater crime, operates as an acquittal of all the degrees above it, and that a new trial, in the absence of a statute declaring the effect of a reversal of the judgment, must be confined to a retrial of the charge upon which the accused was convicted, or of a lower degree. The defendant having been convicted of manslaughter, cannot, therefore, be tried for the commission of a greater crime. It may be suggested that the announcement of this conclusion is premature, and that the question can not be involved until a demurrer to a plea in bar by the defendant has been sustained, a trial and conviction had for the commission of a crime of a higher degree, and the judgment brought before us on appeal for review; but, the statute having provided that when a new trial is ordered the cause shall be retried according to the direction of the appellate court, (section 1454, Hill's Code,) we believe that, in order to save the costs and disbursements incident to an additional trial in case of such conviction, it becomes our duty to direct the mode of retrial upon remanding the cause.

10.   The defendant having been tried as a principal, was convicted of manslaughter, and, there being no accessories before the fact in this grade of crime, and since he cannot be prosecuted for a higher degree, it is contended that as a legal consequence he is entitled to be discharged.   If it be conceded that the defendant's conviction as a principal conclusively established the fact that his codefendant was guilty of manslaughter only, it would necessarily follow that the cause should be remanded with a direction to the trial court to discharge the prisoner.   Malice not being a feature in manslaughter, it has for this reason been held that there can be no accessories before the fact in the commission of that crime [*Boyd* v. *State*, 17 Ga. 194; *State* v. *Mahly*, 68 Mo. 315; *State* v. *Robinson*, 12 Wash. 349 (41 Pac. 51); *Bowman* v. *State* (Texas Crim. App.), 20 S. W. 558]; but, as murder in the second degree involves malice, the principal may be convicted of that degree, and the accessory before the fact, of manslaughter.   In *Jones* v. *State*, 13 Texas, 168, (62 Am. Dec. 550,) LIP-SCOMB, J., in rendering the decision of the court, says: "One might encourage and counsel another to commit some violent outrage on the person of a third person, mayhem or the like, not to kill, but in the execution of this design, a homicide might be committed.   This would be murder in the second degree, under the statute, because it is not embraced in the statute qualification of the evidences of malice, to make it murder in the first degree.   But, it being murder, it falls under the second degree.   Murder in the first degree, under our statute, is 'committed by

poison, starving, torture, or other premeditated and deliberate killing; or committed in the perpetration, or in the attempt at the perpetration of arson, rape, robbery, or burglary, (Hart. Digest, Art. 2515). Now, such killing as is described in the statute cited, as constituting the first degree of murder, would be, at common law, murder with express malice; leaving for the second class all murders with implied malice, not so designated; as would be the case if there was a preconcerted act to commit some other felony, but not to kill, and the killing ensued in the attempt." In order, therefore, to find the defendant Steeves guilty of manslaughter, the jury must first have found his codefendant guilty of murder in at least the second degree, and, having found the defendant guilty as aforesaid, it necessarily follows that they also found Kelly guilty of murder, either in the first or second degree; and, this being so, the defendant is not entitled to be discharged until acquitted, or so ordered by the court.

In the trial of this cause, occupying the attention of the trial court from December thirteenth, eighteen hundred and ninety-four, to the fifth day of the following month, every material point was vigorously contested by eminent counsel representing the state and the defendant, and many alleged errors are assigned as cause for the reversal of the judgment. We have considered only those that we deemed most important, and such as, in our judgment, were prejudicial to the rights of the defendant; and, having reached the conclusions hereinbefore announced, after a careful examination of the record and the very ex-

29 OR.— 8.

cellent briefs submitted by both sides, we feel that the interests of justice will be subserved by a retrial of the cause, and hence it follows that the judgment is reversed, and a new trial ordered in accordance with this opinion.          Reversed.