Argued 10 July; decided 28 July, 1902.

### STATE *v.* AIKEN.

(69 Pac. 683.)

CRIMINAL LAW—CONSPIRACY—APPEARANCE OF CONFEDERATE.

1. Where there is evidence in a criminal case tending to show a conspiracy between defendant and another to commit the crime charged, and that they were both present when the crime was committed, evidence of the physical appearance of defendant's alleged confederate soon after the homicide was admissible.

DECLARATIONS OF CO-CONSPIRATOR SUBSEQUENTLY MADE.

2. Statements made by one of several conspirators—not as a witness, and not in the presence of the accused—concerning the common enterprise, are not competent against another conspirator who is on trial: thus, on a prosecution for murder, it was error to admit a declaration made to another person, in defendant's absence, and after the crime was committed, by a confederate who was not then on trial, that "You ought to see the other fellow," which tended to connect defendant with the crime, and which he claimed did not refer to deceased: *State* v. *Hinkle,* 33 Or. 93, applied.

EFFECT OF WITHDRAWING IMPROPER EVIDENCE—HARMLESS ERROR.

3. Error in admitting evidence is cured by directing the jury to disregard it; but the instruction must make clear the evidence referred to, and a general statement that a certain kind of testimoney is not to be considered will not be sufficient.

From Washington: THOMAS A. McBRIDE, Judge.

James Aiken was convicted of murder in the second degree, and appeals.                                        REVERSED.

For appellant there was a brief over the names of *H. T. Bagley, Dan J. Malarkey,* and *Geo. C. Stout,* with an oral argument by *Mr. Malarkey,* and *Mr. Stout.*

For the state there was a brief over the name of *Harrison Allen*, District Attorney, and *E. B. Tongue*, with an oral argument by *Mr. D. R. N. Blackburn*, Attorney-General, and *Mr. Allen*.

MR. CHIEF JUSTICE MOORE delivered the opinion.

The defendant James Aiken was informed against, jointly with Henry Bacon and Budd Malim, for murder in the first degree, alleged to have been committed in Washington County on December 3, 1900, by shooting and killing one Jung Goey Shu, and, having been separately tried, was convicted of murder in the second degree, and sentenced to imprisonment in the penitentiary for the term of his natural life, from which judgment he appeals.

The state, adopting the theory that the deceased was killed in pursuance of a conspiracy formed by Aiken, Bacon, and Malim, was permitted, over the defendant's objection and exception, to introduce testimony descriptive of Bacon's appearance after the homicide, and detailing certain statements made by him at that time in the absence of the defendant. In order to show the applicability to the case at bar of the legal principle relied upon for reversal, it is deemed necessary to state the substance of the testimony given at the trial: Louie How, a Chinaman, as a witness for the state, testified, in effect, that about 9 o'clock in the evening of December 3, 1900, while he and Shu were occupying the same room in a dwelling in Washington County, three white men entered the house, and one of them, coming to their room, seized Shu and tried to drag him into another room, but witness pulled him back, and, in doing so, was struck over the head with a club. The door, being suddenly closed, caught the intruder's hand, whereupon a shot was fired, killing Shu. The witness then tried to escape by a window, and was again struck over the head with a club by Aiken, whom he recognized; having known him about five years. As soon as he recovered from the effect of the blows he ran to a neighbor's, and informed him of the shooting; and, though he conversed with others, he did not tell of Aiken's participation in the homicide until about a month later, when

he saw him at the police station in Portland, for the reason that it was difficult, on account of his illness, to remember distinctly all that occurred at that time. William Woodard, who kept a saloon in Portland, appearing for the state, testified that on December 3, 1900, Aiken (being employed by him as a bartender) left his place of business about half past 5 in the evening, and about 20 minutes thereafter his codefendant Bacon called and inquired for him; but the latter, soon leaving, did not return until about 11:45 that night. The district attorney, referring to Bacon's appearance at that time, told Woodard to "state what condition he was in." An objection to this command on the ground that it was incompetent, irrelevant, and immaterial having been overruled, and an exception allowed, witness stated that "he was muddy, and had a lick over the right eye, and his clothes were torn on the shoulder." The district attorney then said: "You can give any statement Henry Bacon made." The same objection having been interposed, overruled, and an exception allowed, as in the preceding case, he answered: "Well, his brother asked him—" Here the witness was interrupted by defendant's counsel, who said, "I object to any conversation had with his brother;" but the objection having been overruled, and an exception allowed, Woodard continued: "His brother was sitting, waiting for him, and he says: 'Where the devil have you been? Where did you get that mud? You must have had a scrap.' He said he had. His brother remarked he 'must have got the worst of it.' Henry said: 'You ought to see the other fellow.' That was about all that was said. They had a drink, and then left."

This witness further testified that he did not see Aiken after he left the saloon on the evening of December 3, 1900, until the next morning, when the latter said to him: "I guess Hen (meaning Henry Bacon) killed a Chink (meaning a Chinaman) last night. He said: 'We didn't get a damn cent, either.' That one Chinaman tried to get out of a window, and he ran around the house and clubbed him, and that, when Hen fired, the Chink jumped five feet in the air, and fell,

and that he wanted to take the gun, but Hen would not give it.'' The witness further testified that, prior to the homicide, Wong Jim, Shu's partner, came to the saloon, and, having exhibited some money, Aiken, who seemed to know him, thereafter suggested the idea of going out to his place in Washington County and ''holding him up,'' but the witness declined to accept the proposition. William Bacon, a witness for defendant, testified that though his brother Henry was at Woodard's saloon December 3, 1900, at 10:35 o'clock in the evening, he was not cut or bruised; that his clothes were not torn, and there was nothing peculiar in his appearance,—and, explaining the statements made in Woodard's presence, declared that his brother said he had had a fight with a fellow down town (meaning Portland), with whom he had difficulty a year before. The defendant Aiken, as a witness in his own behalf, denied all the incriminating statements imputed to him by Woodard, contradicted Louie How, and said he spent the evening of December 3, 1900, at his room in a lodging house in Portland, in company with a woman. Her deposition, taken in pursuance of a stipulation, corroborated his testimony in this particular. Several witnesses called by the defendant testified that Woodard's reputation for truth and veracity in the neighborhood in which he resided was bad, and others stated that Louie How never intimated that the defendant was present at the time of the homicide until about a month thereafter.

1. It is contended by defendant's counsel that the court erred in permitting a witness to testify concerning Bacon's appearance after the homicide, and in allowing such witness to detail his declarations made in the defendant's absence, after the termination of the alleged conspiracy, and that the error was not cured by the subsequent instruction to the jury that, if they should find a conspiracy existed, any declarations made by Aiken's codefendants after the homicide could not be accepted by them as evidence of his guilt. Woodard's testimony, if believed by the jury, tended to connect Aiken and Bacon in the commission of the crime charged in the informa-

tion; for he testified that, while Aiken was employed in his saloon, Bacon and Malim visited him every day; that Bacon called for Aiken the evening of the homicide; and that Aiken stated to the witness that Bacon shot the Chinaman, and detailed the manner in which he was killed. Testimony had been introduced tending to show that Shu was shot about 9 o'clock in the evening; that the road from the place where he was killed to Portland was muddy; and that Bacon was seen in Woodard's saloon, about six miles from the scene of the homicide, two hours and forty-five minutes after it occurred, in the condition described by Woodard. If a conspiracy existed to rob these Chinamen, and one of them was killed in the attempt, the testimony having tended to show that Aiken and Bacon were present on that occasion, notwithstanding the conspiracy had terminated, evidence of Bacon's appearance so soon after the homicide, and probably before he had an opportunity to change his apparel, was admissible as against him. Thus, in *People* v. *Cleveland,* 107 Mich. 367 (65 N. W. 216), it was held that where, upon a trial for assault with intent to murder, there is testimony tending to show that another person, jointly charged with the assault, accompanied the person on trial to the place of its commission, evidence of the appearance of such person shortly thereafter, tending to establish his complicity in the crime, is admissible as against the accused. To the same effect, see *State* v. *Struble,* 71 Iowa, 11 (32 N. W. 1); *Ryan* v. *State,* 83 Wis. 486 (53 N. W. 836). The rule under which evidence of the appearance of a jointly charged conspirator soon after the commission of a crime is admissible as against his confederate, who is being separately tried, is undoubtedly based upon the theory that such appearance is the necessary consequence of a joint participation in an unlawful enterprise, resulting from the undistorted rays of the afterglow of the fire of a criminal intent. The evidence of such appearance is not admissible, however, as against the accused, who is being separately tried, unless it first appears that the conspirators have made united preparation for, or jointly participated in, the commission of a crime.

2. The proper foundation having been laid, the admission of the testimony descriptive of Bacon's appearance, unaccompanied by a recital of his explanatory remarks to his brother, would not, as we have seen, furnish the defendant any ground for complaint. But the jury must have inferred from the declaration, ''You ought to see the other fellow,'' that he referred to Shu; and this inference was undoubtedly strengthened by Woodard's testimony in relation to the mud upon his clothing, which the jury would naturally suppose was occasioned by the journey over the road in its then miry condition. After the state had rested, William Bacon, as a witness for the defendant, explained his brother's statement made in Woodard's presence; but the first impression made upon the minds of the jurors must have been that Shu, the Chinaman who was killed, was the ''fellow'' whose appearance should be seen, as a contrast with Bacon's condition. The declaration, ''You ought to see the other fellow,'' when testified to by Woodard, necessarily applied to Shu; and having been made in Aiken's absence after the conspiracy had terminated, if it ever existed, such testimony was inadmissible in evidence: *State* v. *Magone,* 32 Or. 206 (51 Pac. 452); *State* v. *Hinkle,* 33 Or. 93 (54 Pac. 155). The reason for admitting evidence of the appearance of a jointly charged conspirator, as against his codefendant, at his separate trial, when the declaration of the former, made in the absence of the latter, after the commission of the crime charged, is inadmissible, must rest upon the principle that such appearance furnishes trustworthy proof of a joint participation in an offense, while the declaration is mere hearsay, and may have been made to shield a more guilty person from the consequences of his own act by shifting the responsibility upon another.

3. The court having erred in admitting the testimony complained of, the question to be considered is whether the error was cured by instructing the jury to the effect that, if they should find a conspiracy existed, any declarations made by Bacon or Malim in Aiken's absence after the homicide could not be accepted by them. A sharp conflict of judicial utter-

ance is to be found in respect to whether an error committed by admitting incompetent testimony is cured by withdrawing it: 1 Thompson, Trials, § 723. Whatever the rule may be in other states, it is quite well settled in this that an error committed by inadvertently admitting improper testimony is cured by specifically withdrawing it: *State* v. *Foot You,* 24 Or. 61 (32 Pac. 1031, 33 Pac. 537) ; *State* v. *McDaniel,* 39 Or. 183 (65 Pac. 520). In the case at bar, Woodard's testimony relating to Bacon's declaration, which the jury must necessarily have understood as referring to the appearance of Shu, was not specifically withdrawn. The admission of incompetent prejudicial testimony influences the minds of jurors, and, in order to remove the impressions thus created, the direction of the court not to consider such testimony must be so specific that the jurors cannot possibly mistake the instruction: *Johnson* v. *State,* 17 Ala. 618. The court did not admonish the jury not to consider the declaration made by Bacon to his brother in Woodard's presence, but stated to them generally not to consider any declarations made by Bacon or Malim in Aiken's absence after the commission of the homicide. This, in our opinion, was not sufficient to call the attention of the jurors to the particular testimony sought to be excluded; for they may have understood, notwithstanding the court's instruction, that the statement made by Bacon to his brother in contrasting his appearance and the condition of his clothing with that of the "other fellow," which phrase they might reasonably have believed referred to Shu, was to be considered by them, as against the defendant, in determining his guilt or innocence; and hence the judgment must be reversed, and the cause remanded for a new trial.          REVERSED.