Submitted on brief November 29; reversed December 20, 1932

## STATE *v.* SLIM ET AL.
## STATE *v.* WOLFE
### (17 P. (2d) 314)

*W. P. Myers,* of Klamath Falls, for appellant.

*T. R. Gillenwaters,* District Attorney, and *D. E. Van Vactor,* Deputy District Attorney, both of Klamath Falls, for the State.

BROWN, J. The defendant was prosecuted for the crime of robbery, being armed with a dangerous weapon, and was convicted. From the judgment entered on the verdict rendered, he has appealed.

On the trial, one Dewey Horn, president of the Bank of Bonanza, situate at Bonanza, Klamath County, Oregon, testified that about 1:50 p. m., on November 12, 1931, he, with two employees, was pres-

ent in the bank, when three men drove up in an old sedan and parked close to the entrance and entered the bank. As to what then took place, he testified:

"Bradley stopped at the window number 1, Nordstrom at window number 2, and John Doe Slim walked on back to the point in here (indicating); and they said, 'We mean business—stick 'em up,' which we all complied with. * * * Nordstrom left the window, * * * coming around * * * inside the counter to position near window number 1, and took the money that was in the till. * * * Then they said, 'You fellows have got to open your safe.' * * * I unlocked it and started handing the money out. He said, 'I will attend to that, go on.' He took me back here to position window number 1, and then Nordstrom went back in the vault and took the money out of the safe, and then they proceeded to back out toward the door, and as they neared the door they called my brother, John, up toward them, * * * and at that time then commanded us all to lie down. * * * As soon as I heard their car starting I run out through the side door * * * in our bank building. * * * Their car was going down Market Street. I took two shots at it and also moved on down."

According to the testimony of this witness, the alleged robbers took and carried away $5,295.00. He further testified that defendant Bradley "had a gun on me at different times," and that "John Doe Slim had a gun on my brother John at all times."

Bradley and Nordstrom were arrested and each pleaded guilty to the charge of the crime of robbery, being armed with dangerous weapons, as alleged by an information filed by the district attorney accusing them of the robbery as related by the testimony of Dewey Horn.

Following the arrest of Bradley and Nordstrom, Wolfe, the defendant herein, was arrested on suspicion

and lodged in jail. Thereafter there was returned by the grand jury against this defendant and John Doe Slim, whose true name was unknown, an indictment, which reads as follows:

"The said George W. Wolfe and John Doe Slim, on the 12th day of November, 1931, in the said county of Klamath and state of Oregon, then and there being, and then and there acting together, and then and there acting with Horace Nordstrom, also known as Fred Johnson, and Robert A. Bradley, also known as Bob Wilson, and then and there being armed with certain dangerous weapons, to wit: a 32:20 calibre Colt revolver and a .38 calibre Smith and Wesson revolver, each of said revolvers being loaded with powder and metallic ball, did wilfully, unlawfully and feloniously assault John S. Horn, Dewey Horn and Sarah Poole, who were then and there the agents and employees of the Bank of Bonanza, an Oregon corporation, by then and (there) feloniously aiming and pointing said 32:20 calibre Colt revolver and .38 calibre Smith and Wesson revolver at and toward the bodies of the said John S. Horn, Dewey Horn and Sarah Poole, with intent, if resisted, then and there to kill or wound the said persons so assaulted, they, the said George W. Wolfe, John Doe Slim, Horace Nordstrom, also known as Fred Johnson, and Robert A. Bradley, also known as Bob Wilson, then and there being within shooting distance of the said John S. Horn, Dewey Horn and Sarah Poole, and did then and there wilfully, unlawfully and feloniously rob, steal and carry away from the persons of the said John S. Horn, Dewey Horn and Sarah Poole, against their will, a certain sum of money, to wit: the sum of Five Thousand Two Hundred Ninety-five and 00/100 Dollars, the said sum of money being then and there the property of the said Bank of Bonanza; contrary," etc.

The alleged robber indicted under the name of John Doe Slim avoided arrest and remains a fugitive from justice. The defendant Wolfe answered the indictment

by filing a demurrer, which was overruled. Following his plea of not guilty, Wolfe was put upon trial, and it appears from the bill of exceptions that Bradley, an accomplice, was, by order of the court, removed from the penitentiary and taken to Klamath county for the purpose of testifying as a witness for the State in the case against Wolfe, who the prosecution asserts was in complicity with the three men who entered the bank.

Bradley was asked by the prosecution if he had "heretofore entered a plea of guilty to the crime of assault and robbery, being armed with a dangerous weapon." The defendant interposed an objection to this question, "for the reason that the State is compelled to prove the substantive crime by testimony other than by any confession or admission of an accomplice." The objection was overruled, and an exception reserved. Mr. Myers, the defendant's attorney, then objected "to this entire line of testimony," and the court answered: "It will be so understood, and the record will so show." Bradley's testimony continues:

"Q. Where did you first meet Mr. Wolfe?

"A. The only place I ever saw him was in the jail, county jail.

"Q. Did you ever see him in Sacramento?

"Mr. Myers: Now, just a moment, if Your Honor please. We object to that as leading and suggestive, and for the further reason that the witness has testified, if I understood it correctly, that the only time he ever saw him was in the county jail. I would like to have the reporter read that.

"The Court: He does not have to read it. I heard him testify to it.   *   *   *

"Q. You never saw him before?

"A. Except in jail."

At this point a paper entitled "Statement of Bob Wilson," consisting of seven pages, wherein Wilson

(Bradley) accused Wolfe of being a principal in the crime of robbery charged in the above indictment although not physically present at the commission of the crime, was marked as Plaintiff's Exhibit B for Identification. In part, this statement reads:

"I met George W. Wolfe in front of a pool hall at Fourth Street near K Street in Sacramento, California * * *. This fellow drove up in a big sedan and motioned for me to come over. I walked over and he asked me how long I had been in Sacramento, and I thought he was nuts or something, so I told him I had been there a couple of days and was figuring on leaving town right away. I did think he might have been a cop. He asked me how I would like to make ten thousand dollars. I told him I would do most anything for that much money. Then he asked him (me) if I had a buddy, and I told him yes, so he said for me to see my buddy and meet him at the same place around 9:00 or 10:00 the next day. * * * He drove us out of town and told us about it (robbing a bank), and we decided to go with him. We left that day around 2:00 o'clock in the afternoon, me, Nordstrom, and this fellow called George Wolfe (defendant). * * * We got a couple of pints of whiskey and Nordstrom and I drank them and started in the bank at Bieber. Wolfe didn't drink. I went in the bank first. * * * There were two women and a man in the bank. One of the ladies and man were writing on a desk. * * * I guess I must have got cold feet and couldn't go through with it. I asked if the manager was in and she said no, so we both walked out. We had one gun with us. Wolfe bought this gun at Marysville."

Concerning the robbery charged in the indictment, the statement recites, in substance, that Wolfe's part was to drive the automobile in which the robbers intended to make their get-away after robbing the bank at Bonanza; that, when the other three men entered the Bonanza bank at the time of the robbery, Wolfe,

according to arrangement, was watching and waiting in the automobile in order to pick them up and enable them to escape after they had carried their plans into execution; that, with his assistance, they made a getaway, and the loot was divided into four parts.

Over the objection of defendant's counsel, Bradley identified the statement as one made by him on November 21, 1931, in the presence of L. L. Low and Rex A. McMillan. On further attempt by the prosecution to interrogate the witness in regard to the foregoing statement, the court stated:

"It would take me some time to look it over (the statement). Just question him in regard to the statement, Mr. Van Vactor, and I will withhold a ruling on whether it is admissible or not.   *   *   *''

After witness had testified that he recalled making the above statement, the prosecution then asked him whether he was subjected "to any duress, threats, or anything of that kind," and counsel for defendant made the following objection:

"Now, if the Court please, I object, on the grounds he is continuing to try to impeach his witness   *   *   *, and that he is trying to bring forth a confession at this time in direct conflict with the witness's testimony that the first time he ever saw the defendant Wolfe—

"The Court: Objection overruled.

"Mr. Myers: We may have an exception."

His testimony continues:

"Q. Now, bearing in mind the statement you made in here, do you still say that that is right?

"A. George W. Wolfe, that I made that statement in there, is not him.

"Q. Oh, this is not the man? A. No.

 *     *     *     *     *

"Q. I will ask you this, Bob, whether or not you told Sheriff Low that if he could give you the license

number of the man's automobile that participated in this holdup, you would tell him if it was right. * * *

"A. I don't remember whether I did or not. I was so excited when I made out that statement, and I did not know what I was saying half the time.

      *        *        *        *        *

"Q. And you still say that this statement is true?
"A. Yes.

"Mr. Van Vactor: If Your Honor please, I would like to submit this statement to you for—

"The Court: All right, I will defer a ruling on it. I was connected with the district attorney's office in one way or another for eight or ten years, and I never ran across a case direct—like this, so I want to refresh my ˙recollection before I rule on the admissibility of it."

The witness was thereupon excused from the stand, and the purported written statement made by him on November 21, 1931, was offered and received in evidence over the objection of the defendant that it was hearsay, that it was not taken or given in the presence or hearing of the defendant, that defendant had no opportunity to cross-examine the witness in relation to the statement, and that it was incompetent, irrelevant and immaterial. These objections having been overruled by the court, the written statement was given to the jury as evidence in the case against the defendant without any restriction as to its purpose by instruction or otherwise. At the close of the State's case, the defendant moved for a withdrawal from the consideration of the jury of all testimony of the various witnesses relating to any and all transactions in the state of California. Through his attorney, he again reiterated his objections to the statement of Robert Bradley, and asked that it be withdrawn from the consideration of the jury, for the reasons stated above,

and for the further reason that it contained prejudicial· matter that in no way connected the defendant with the particular crime charged in the indictment. The court denied the motion, and the defendant reserved an exception to the ruling.

■ The case comes before us with but two assignments of error. In his first assignment the defendant declares that the indictment returned by the grand jury in this cause was void and of no force or effect for the reason that it disclosed by endorsement thereon ·that three certain named persons were the only witnesses called and examined by the grand jury. In this assignment is the first mention of this alleged error. We have examined both the bill of exceptions and the judgment roll with care, and we have failed to find therein any motion made by the defendant to annul the indictment, at any time after his arraignment, or otherwise. See *State v. Reinhart,* 26 Or. 466 (38 P. 822) ; *State v. Smith,* 33 Or. 483 (55 P. 534).

■ The second assignment involves the holding of the court in overruling the defendant's objection to introducing in evidence and placing before the jury the statement made by defendant's alleged accomplice, Robert A. Bradley. It appears from the record that the question of the relevancy of this statement arose in a number of ways during the trial. The defendant not only objected to its introduction but he likewise objected to the introduction of the several declarations contained therein, and, finally, after it was received in evidence and delivered to the jury, he moved to have it withdrawn from the consideration of the jury.

That this statement or confession was irrelevant and prejudicial, and that its introduction as evidence against defendant Wolfe was error, is plain. The ques-

-tion is not new, but has been before this court many, many times, and its ruling is in harmony with that of courts in other jurisdictions.

We shall first notice the case of *State v. Tice,* 30 Or. 457 (48 P. 367). This was a criminal case and involved the forgery of a will. In his statement of the cause, Mr. Justice WOLVERTON, speaking for the court, wrote:

"The defendant was indicted with others and convicted of the crime of forgery. The subject of the forgery is an instrument purporting to be the last will and testament of one Nancy M. Love, and the crime consists, as the indictment charges, in falsely making and forging the name 'Nancy M. Love, her X mark' thereto."

One George G. Smith, alleged to be a co-defendant of Tice, who, previous to the Tice trial, had pleaded guilty and received his sentence, testified that "Tice wrote Nancy M. Love's signature to the alleged will, and then his own." The record discloses that one Eaton was permitted, over the objection of the defendant, to recount before the trial jury what George W. Edgar, one of the co-defendants, had narrated to him concerning what the witness said he "supposed was the history of this instrument"; and, in passing upon the issue thus presented, the court said:

"Admitting that Edgar was a co-conspirator with the defendant in the forging of this will, yet this testimony was clearly incompetent to show the participation of the defendant in the forgery. It was a subsequent narration of the transaction, and could not be considered as part of the res gestae, or as declarations concurrent in time with the commission of the unlawful act. The rule regarding what declarations of a party to a conspiracy may be used against his co-conspirators is well laid down in Metcalf v. Conner, 12 Am. Dec.

340, and has been adopted by this court in Sheppard v. Yocum, 10 Or. 402; and again in Osmun v. Winters, 30 Or. 177, 46 P. 782."

The court then quoted from *Metcalf v. Conner,* supra, as follows:

" 'Any declarations by one of the parties at the time of committing the unlawful act are, no doubt, not only evidence against himself, but, as being part of the res gestae, and tending to determine the quality of the act, are also evidence against the rest of the party, who are equally as responsible as if they had themselves done the act. But what one of the party may have been heard to say at any other time as to the share which others had in the transaction, or as to the object of the conspiracy, cannot be admitted as evidence to affect them, for it has been solemnly decided that a confession is evidence only against the person himself who makes the confession, and not against others'."

It likewise set out the following well-established principle of law announced by Mr. Wharton in his work on Criminal Evidence (9th Ed.), 699:

"When the common enterprise is at an end, whether by accomplishment or abandonment, no one of the conspirators is permitted, by any subsequent act or declaration of his own, to affect the others."

In the case of *State v. Hinkle,* 33 Or. 93 (54 P. 155), Richard Hinkle was charged as being an accomplice of one William Bare in the slaying of George A. Scott for the purpose of robbery. In that case one Henry Strickland was permitted to testify over the objection and exception of the defendant that after Bare had been tried and convicted for killing Scott he made the statement, during Hinkle's absence, "that, in pursuance of an agreement with the latter, he killed Scott in an attempt to rob him." This court properly held that such statement made by an accomplice after the

common enterprise was ended, and not in the presence of the accused, was not competent evidence against him.

A noted case was *State v. Magone,* 32 Or. 206 (51 P. 452). In that case the defendant, Daniel Magone, was jointly indicted with Charles Montgomery, William Rector and Edward Long, for the crime of disinterring a human body. The bill of exceptions showed that witnesses were allowed to testify, over defendant's objection and exception, that Montgomery, Rector and Long, in the absence of Magone, made declarations that, at the solicitations of Magone, they agreed to aid him in the commission of the crime charged in the indictment, and that, in pursuance thereof, they exhumed the body and reburied it in another place, hoping to receive from the relatives of the dead a sum of money for its return. Magone through his counsel, objected to the reception of the evidence, and the court, in a Per Curiam opinion, wrote:

"The rule is universal that, after a conspiracy has terminated, either successfully or in defeat, the admissions of one conspirator by way of recital of past facts are a confession of his own participation, and are admissible against himself, but are not admissible against his companions in the unlawful enterprise. Logan v. United States, 144 U. S. 263, 12 Sup. Ct. 617; Sparf v. United States, 156 U. S. 51, 15 Sup. Ct. 273; Sheppard v. Yocum, 10 Or. 417; Osmun v. Winters, 30 Or. 177, 46 P. 782; State v. Tice, 30 Or. 457, 48 P. 367."

The judgment of conviction in that case was reversed.

*State v. Aiken,* 41 Or. 294 (69 P. 683), was a murder case wherein James Aiken was accused jointly with Henry Bacon and Budd Malim of slaying one Jung Goey. The prosecution adopted the theory that the deceased was killed in pursuance of a conspiracy formed by Aiken, Bacon and Malim. Counsel for de-

fendant, as a ground for rehearing, asserted that the court erred in permitting witness to testify concerning Bacon's appearance after the homicide, and in allowing this witness to detail certain declarations made in the absence of the defendant and after the termination of the alleged conspiracy. The defendant's counsel contended that declarations of an alleged co-conspirator made after the termination of the conspiracy were not admissible as against Aiken. This court, in stating why such testimony should have been excluded, said, in substance, that a declaration of a co-defendant or accomplice made in the absence of the defendant on trial, and after the commission of the crime charged, is inadmissible, for the reason that "the declaration is mere hearsay, and may have been made to shield a more guilty person from the consequences of his own act by shifting the responsibility upon another."

The decisions reviewed above are invoked by this court in the case of *State v. Hyde,* 88 Or. 66 (169 P. 775, 171 P. 583). This was a suit brought by the State of Oregon to set aside and cancel state deeds to about fourteen hundred acres of land in Hood River county. The opinion in the case was rendered by Mr. Justice McCAMANT, who, speaking for the court, held to the doctrine announced in the foregoing cases, to the effect that the declarations of a conspirator made subsequent to the acts pursuant to the conspiracy are not admissible in evidence against the declarant's co-conspirators.

*State v. Yee Guck,* 99 Or. 231 (195 P. 363), the defendant was accused of murder as the result of an affray wherein occurred the death of one of the participants in a tong war between rival Chinese factions. According to the tale told by the defendant, he and

one of his co-defendants were walking west on Flanders street in Portland, Oregon, and about the time they reached the intersection of that street with Sixth street certain members of a rival tong fired on them from the opposite side of the street, and they immediately returned the fire. The defendant assigned error of the court in admitting in evidence declarations of a co-conspirator made after the commission of the object of the conspiracy; and, with regard to this assignment, Mr. Justice BURNETT, delivering the opinion for the court, made the following statement:

"A combination of individuals having been shown to exist for the accomplishment of a criminal purpose, it may be likened to a partnership wherein the declarations of any partner will bind the firm; but, when the contract of partnership is ended, the firm business wound up, and the firm dissolved, the declarations of any former partner will not bind any of those who were once associated with him in the business. It is on this analogy that the subsequent declarations of a conspirator can bind only himself, and not his criminal associates."

Then follows citation of local and federal cases.

In *State v. Weston,* 109 Or. 19 (219 P. 180), a homicide case, there appears a valuable discussion relating to the question of admissibility of hearsay evidence. That case was reversed by this court on account of the admission of hearsay evidence into the record; and, in rendering our opinion therein, we said:

"A safeguard provided against hearsay evidence, that shelters alike the strong and the weak, the innocent and the guilty, is: 'In all criminal prosecutions, the accused shall have the right  *  *  *  to meet the witnesses face to face  *  *  *.' Art. 1, Sec. 11, Or. Const.

" 'The right of confrontation is the right to the opportunity of cross-examination.' 3 Wigmore on Evidence (2d Ed.), § 1365."

The defendant in this case has been accused and convicted of one of the most serious crimes known to the law. Because of this crime, and his conviction thereof, the trial court adjudged that he should be confined in the State Penitentiary for a term of ten years. That the defendant was not personally present at the commission of the robbery is not questioned. However, under our statute, any and all distinction between a principal and an accessory before the fact, in cases of felony, has been abrogated, "and all persons concerned in the commission of a felony, whether they directly commit the act constituting the crime, or aid and abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of a misdemeanor." Oregon Code 1930, § 13-724. But, putting aside all other issues, it is our firm conviction that, by reason of the fatal error arising out of the trial as hereinbefore clearly pointed out, this cause must be reversed and remanded to the lower court, where it may be lawfully retried. Regrettable though the circumstance may be, it is not possible for this court to retry the case under the provisions of Article 7, of the Constitution of Oregon, for the reason that but little of the evidence has been brought before us; and we can but enforce the law as it is written.

" 'Guilty men may have escaped punishment altogether; others may have been punished too lightly for their crimes; others may have unreasonably delayed their punishment'; but none of these conditions, nor all of them together, can excuse the court in denying to a human being upon trial for his life or for his liberty the right that the law of the sovereign state of Oregon gives him, the right to a fair and impartial trial." State v. Weston, 102 Or. 102 (201 P. 1083).

This cause is reversed and remanded.