Argued January 19, affirmed March 9, petition for rehearing
denied April 5, petition for review denied
June 27, 1972

# STATE OF OREGON, *Respondent, v.* VINCENT LOUIS CAPITAN (C-55336), *Appellant.*

494 P2d 443

*William B. Crow,* Portland, argued the cause and filed the briefs for appellant.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on

the brief were John W. Osburn, Solicitor General, and Lee Johnson, Attorney General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

LANGTRY, J.

Defendant appeals from conviction of first degree murder. ORS 163.010.

Defendant and Michael John "Bobby" Wright, his stepson, were separately indicted for the murder of one Carlos Mendoza, and defendant was tried separately. He asserts seven errors which will be noted as they are discussed.

Evidence supported the following. On April 25, 1968, Mendoza's body was found in a 1956 Chevrolet parked near the Portland airport. The automobile had been stolen from a parking lot in the same general area on April 24. Mendoza had suffered seven head shots from a .25 caliber pistol.

On March 5, 1968, defendant and Mendoza had been charged with larceny in Yamhill County. About two weeks before trial on this charge, defendant suggested to Mendoza that Mendoza leave town so that they would not be seen together. Nevertheless, Mendoza was subpoenaed to appear in defendant's Yamhill County trial as a state's witness. Mendoza appeared pleased when the subpoena was served upon him, and remarked to his bail bondsman that he would be able to get money from defendant as a result, and that the state would be unable to prove its case against defendant unless he testified. Three witnesses for defendant testified falsely at the Yamhill County trial, which was held after Mendoza's death, that at the

time of the larceny they were with defendant in Portland. The falsity of their testimony was disclosed at the larceny trial.

One of the false witnesses, Janet Sherman, who was a former girl friend of defendant, testified in the case at bar that about a week before Mendoza's death defendant had remarked that he thought Mendoza had made a deal with the Yamhill County District Attorney; that "it would be hard to find out who killed a man found in a stolen car shot out near the airport"; and that he was going to pay a thousand dollars to have the job done.

At 10 p.m. on April 24, 1968, defendant telephoned Mendoza. Mendoza received the call at a neighbor's residence, returned home, and told his wife, "I don't know about that Capitan * * * 'He wants me to help him do something.'" He immediately put on some old clothing and left. She never saw him alive again.

One Harris testified that on the night of April 24, 1968, he, Benjamin L. Willis, and Dennis L. Kniss were at a drive-in restaurant in the airport area. After Willis placed some telephone calls, the three went to a bowling alley and stole a 1956 Chevrolet which Harris said resembled the automobile in which Mendoza's body was found. They parked this automobile in an inconspicuous location, returned to the restaurant, and placed at least one more telephone call. Shortly thereafter, defendant and "Bobby" Wright drove up in one automobile and Max Fry and a girl drove up in a white, tan or beige 1960 or 1961 Ford station wagon.

About 10 p.m. defendant walked to a telephone booth and when he returned told Wright and Fry:

"Go pick him up." Wright and Fry drove away in the stolen Chevrolet. The others returned to the restaurant where defendant and the girl sat in the Ford. Kniss and Willis left and Harris entered the Ford. Shortly thereafter, when Harris saw the stolen Chevrolet go by with two or three occupants in it, he pointed it out. With the girl driving, the Ford and its occupants followed the Chevrolet to a place where it was parked in the area where it and Mendoza's body were later found. Defendant told the girl to stop. Wright and Fry ran from the Chevrolet and entered the Ford. It was driven back to the vicinity of the restaurant and en-route Wright remarked, "He's a dead son of a bitch."

A reserve deputy sheriff testified he saw automobiles at the airport location around 11 p.m. on April 24, 1968. He described them as a light-colored car, a yellow and black 1950 or 1951 Plymouth, and a white 1961 or 1962 Ford station wagon.

Janet Sherman testified that the day after the murder defendant told her that he had had Mendoza killed; that he had an alibi to the effect that he and Wright had been at a bar that night, had created some disturbance, had been asked to leave, and spent the remainder of the evening at home with others present. He also told her that he had disposed of the murder weapon.

Defendant, his wife, and "Bobby" Wright's girl friend all testified that defendant was at home the entire evening and night of April 24-25, except for a brief period between 8 and 9 p.m., when he and Wright went to a tavern to purchase some beer; and that Wright and his girl friend left between 11 and 11:30 p.m.

On rebuttal the state produced a witness who

testified that he was with defendant between 4 and 8 p.m. on April 24 at several locations in downtown Portland while defendant was looking for someone named "Carlos"; that he left defendant at the home of one Susan Thorne; and that he saw defendant and Miss Thorne leave the house within minutes after he left.

Defendant's first three assignments of error relate to his indictment and trial for larceny. The state's thesis was that defendant killed Mendoza because he thought the victim had made a deal with the district attorney to testify against him; that he knew, although only $24 was involved in the larceny, a conviction would result in a substantial sentence because of his prior convictions.

 Through its first witness the state introduced as exhibits the informations and judgment orders of conviction for perjury against defendant's three false witnesses in the larceny trial. Defendant objected to this evidence, asserting it only served to blacken his character by proof of irrelevant collateral misconduct.

 Evidence that a criminal defendant has committed other crimes is ordinarily inadmissible, subject to exceptions. *State v. McLean,* 255 Or 464, 470, 468 P2d 521 (1970). One exception is evidence of other criminal acts which form part of a common scheme, design, or system of criminal action. 22A CJS 782, Criminal Law § 688 (1961). A reason for this exception is that such evidence tends to show motive, *State v. McDonald,* 231 Or 24, 46-47, 361 P2d 1001 (1961), *cert denied* 370 US 903, 82 S Ct 1247, 8 L Ed 2d 399 (1962), which, in turn, may be probative of identity. McCormick, Evidence 322, 330, § 157 (1954). In the

case at bar the evidence that defendant suborned perjury shared a common ground under this exception with the charge of murder, namely, obstruction of justice in the larceny trial. Although the informations charging perjury were unnecessary and superfluous to this proof, their admission into evidence engendered no harm to defendant since the judgment orders, which were properly admitted, embodied the informations.

■ ■ To support its contention that defendant had a motive to silence Mendoza, the state first introduced the judgment order in the larceny case which recited defendant's indictment, conviction, and sentence to five years in prison. It proved too much. A motive to kill could be found whether defendant was convicted or not. *State v. Baldwin,* 47 NJ 379, 221 A2d 199, 206, *cert denied* 385 US 980, 87 S Ct 527, 17 L Ed 2d 442 (1966). To that end, the larceny indictment would have sufficed to show *apprehension* of conviction and, thus, motive.[1] We cannot see, however, how this surplusage prejudiced defendant, since the jury subsequently, legitimately, came into possession of this knowledge through the many references in the testimony to defendant's transfer from the Oregon State Penitentiary to the Multnomah County jail for the murder trial, and other evidence indicating he had recently been convicted. *See State v. Joseph,* 252 Or 610, 613, 451 P2d 468 (1969).

■ ■ To further establish defendant's fear of conviction of larceny the state introduced the judg-

[1] The state argues in its brief that evidence of conviction was relevant in countering defendant's claim of innocence on the larceny charge. While this argument would have some force after defendant had put on his case, it had none at the point where the judgment order was introduced.

ment order for enhanced penalty on the larceny conviction, entered some six months after the larceny conviction. It showed, *inter alia,* (a) the finding of the court that defendant was "duly and regularly convicted" of two prior felonies besides the larceny[2] (describing each) and, (b) the enhanced sentence of imprisonment not to exceed 20 years.

Conviction for the larceny charged had a seven year maximum prison sentence, ORS 164.320, in itself probably enough to motivate a depraved mind to murder. However, it was proper for the state to introduce this evidence. The state is entitled to prove its case to the hilt. Probative value here outweighed potential prejudice. *State v. Kristich,* 226 Or 240, 246, 359 P2d 1106 (1961). As in (2) above, the exhibit proved too much in going beyond possible *apprehension* to the actual result. But the state had the right to prove the prior convictions and the length of enhanced penalty defendant might apprehend. In this regard, what the enhanced penalty assessed actually was, was no more than he might apprehend; hence, any error was harmless.[3]

■ ■ ■ The state introduced, over defendant's objection, an indictment charging "Bobby" Wright

[2] The Yamhill County District Attorney alleged three prior felonies, two of which the circuit court found defendant to be "duly and regularly convicted." We affirmed the judgment in State v. Capitan, 2 Or App 338, 468 P2d 533 (1970).

[3] Defendant cannot be heard to complain of the portion of the order describing the previous felonies and the sentence of 20 years. The portion of the order reciting his prior convictions was relevant and properly admissible. It would have been proper for the defendant to move that the irrelevant or unnecessary parts, i.e., the description of the felonies and the enhanced penalty sentence, be excised. *Cf.* State v. Wikum, 6 Or App 405, 409, 488 P2d 815, Sup Ct *review denied* (1971). He failed to do this and objected only to admission of the record as a whole.

with the murder of Mendoza. After reading the indictment to the jury, the court instructed:

> "* * * [T]his indictment is not evidence. It is a mere pleading. It is not evidence of the guilt of the person charged and is not to be considered by you as such. And it is introduced for the sole purpose to show the fact that—that an alleged coconspirator has been similarly charged with this particular crime * * *."

The court correctly stated the law—an indictment cannot infer or be used as evidence of guilt. *State v. Fitzgerald,* 186 Or 301, 205 P2d 549, 206 P2d 808 (1949). But the evidence was simply nonprejudicial surplusage. There was no real difference between this situation and that where two defendants are jointly indicted and tried separately. In each situation the jury knows another person besides the one before it also is charged.

■ ■ As part of the state's case-in-chief, Donna Chadwick, a prostitute under the protection of "Bobby" Wright, testified that on or about April 20 she was severely beaten by Mendoza. The next day she reported this to Wright. Wright armed himself with a small caliber gun and said he was going to kill Mendoza. An hour or two later he returned and told her he had threatened Mendoza with the gun.

Over defendant's objection she further testified that sometime between 11 p.m. on the 24th and 1:00 a.m. April 25, Wright came into her hotel room and said,

> "[Y]ou don't have to worry about Carlos [Mendoza] anymore * * * he's dead,"

further relating that he had shot Mendoza six or eight times.

Later in the state's case a Simon Barber testified over defendant's objection that Wright was present in Barber's hotel room on the day the newspapers reported the discovery of Mendoza's body, and that when the newspaper account was read, Wright corrected that account with regard to the number of times Mendoza was shot and the year of manufacture of the automobile in which his body was found.

ORS 41.900 (6)④ sets out the authority supporting admission of such statements.

However, defendant grounds his objection to this testimony on the rule stated in *State v. Magone,* 32 Or 206, 209, 51 P 452 (1897):

"* * * The rule is universal that, after a conspiracy has terminated, either successfully or in defeat, the admissions of one conspirator by way of recital of past facts are a confession of his own participation, and are admissible against himself, but are not admissible against his companions in the unlawful enterprise * * * [citing cases]."

We think the evidence supports the conclusion that the conspiracy had ended at the time Wright made the challenged statements.

All Oregon cases we have found applying the rule enunciated in *Magone* involved hearsay statements by conspirators which somehow *implicated the coconspirator* on trial. *See,* for example, the cases summarized in *State v. Slim and Wolfe,* 141 Or 174, 17

---

④ ORS 41.900 provides:

"Evidence may be given of the following facts:
"* * * * *

"(6) After proof of a conspiracy, the declaration or act of a conspirator against his coconspirator, and relating to the conspiracy.
"* * * * *."

P2d 314 (1932). The same appears true in other jurisdictions. *See,* Annotation, Evidence—Coconspirators' Statements, 4 ALR 3d 671 (1965); *but see, Bouldin v. State,* 87 Tex Crim 419, 222 SW 555 (1920). Indeed, the *Magone* rule often has been attributed to the fundamental right of every defendant to confront the witnesses *against* him, as guaranteed by the Sixth Amendment. McCormick, Evidence 480, 482, § 231 (1954). When, as in the case at bar, the out-of-court statement does not implicate the co-conspirator on trial, we cannot fathom any constitutional reason or any rationale underlying the hearsay rule which dictates exclusion. Yet, these statements are hearsay and we find no Oregon decisions which would admit them.[9] If it was error to admit these statements the error was at most not very harmful since they did not re-

---

[9] The main justification for exclusion of hearsay is that the opposing party has no opportunity to confront in court the person making the statement and test his veracity and accuracy by cross-examination. State v. Kendrick, 239 Or 512, 398 P2d 471 (1965). It is unlikely that cross-examination of Wright would have been possible since he no doubt would have asserted his Fifth Amendment rights (his prosecution was pending at the time). The factual basis of Wright's statements was corroborated by Harris's testimony. Moreover, the circumstances under which Wright made these statements, and their content, give little reason to suppose he misrepresented the facts—the statements were spontaneous and against his penal interest. Since the statements did not implicate anyone but Wright, they could not be attributed to an effort "to shield a more guilty person from the consequences of his own act by shifting the responsibility upon another." State v. Aiken, 41 Or 294, 299, 69 P 683 (1902).

All these factors are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the defendant. *See,* for example, Dutton v. Evans, 400 US 74, 91 S Ct 210, 27 L Ed 2d 213, 227 (1970). The Uniform Rules of Evidence would allow these statements into evidence as "declarations against interest." Rule 62 (10), Oregon State Bar Uniform Rules of Evidence; *see* Swearingen, Uniform Rules of Evidence, 42 Or L Rev 200, 223-24 (1963).

late to defendant's connection with the murder, although they did corroborate Harris's testimony which did connect defendant with the murder. *See State v. Wells,* 33 Mont 291, 83 P 476 (1905), *cf. Delli Paoli v. United States,* 352 US 232, 77 S Ct 294, 1 L Ed 2d 278 (1957).

■ ■ A letter written by defendant while in the Multnomah County jail awaiting trial for murder was found in his cell during a routine inspection. It was addressed to "Susan," apparently a girl friend, and detailed plans for flight and concealment. The letter was photocopied and returned to the cell in order not to alert defendant that his plans were known. Portions of the letter were received into evidence over defendant's objection on grounds of relevancy. On appeal, defendant asserts for the first time another objection—that the letter was seized as the result of an unlawful search and seizure. The proper time for this objection was prior to trial by a motion to suppress. *State v. Marcus,* 2 Or App 269, 271, 467 P2d 121, Sup Ct *review denied* (1970).

■ ■ With reference to the objection as to relevancy, evidence that one plans to escape from custody is a circumstance from which consciousness of guilt may be inferred. *Commonwealth v. Green,* 302 Mass 547, 20 NE2d 417, 420-21 (1939); *see State v. McIntire,* 2 Or App 429, 435-36, 468 P2d 536, Sup Ct *review denied* (1970). When a defendant is held under two distinct charges, however, the authorities differ as to whether evidence of flight is admissible, because it is usually impossible to determine from which charge he fled or attempted to flee. *Compare: State v. Crawford,* 59 Utah 39, 201 P 1030, 1033 (1921) (holding evidence inadmissible), with *People v. Yazum,* 13 NY

2d 302, 246 NYS2d 626, 196 NE2d 263 (1963) (holding evidence admissible, weight for jury). *See generally,* 22A CJS 478, 480, Criminal Law § 631 (1961). At the time the letter was written defendant was serving a sentence for larceny and was under indictment for murder. The trial court wisely instructed the jury:

"* * * [T]here was some testimony * * * that the defendant planned to escape. * * * [P]lans to escape taken alone [do not] raise a legal presumption of guilt so that an inference of guilt should be drawn therefrom. At most it is only one circumstance to be considered by you, the jury, with the reasons that prompted it, tending to show guilt, or by which an inference of guilt may be raised, and it has no probative force whatsoever unless it satisfactorily appears that the accused planned to escape for the crime charged. And, as you remember, he was at that time serving a five year sentence for a matter arising out of Yamhill County."

This instruction alone was sufficient to remove the possibility of prejudice to the defendant, although the record contains defense testimony from which it could be inferred the murder indictment motivated plans for escape rather than the larceny sentence. The amount of weight accorded to this evidence was for the jury to decide.

 ██ Defendant asserts the indictment failed to give him notice of the true nature of the charge against him. The indictment charged that defendant did:

"* * * unlawfully and feloniously * * * kill one Carlos Mendoza by shooting him with a pistol * * *."

The state's case, of course, contended defendant aided or procured Wright for the murder. One who aids

and abets another in the commission of a crime is a principal to the crime and "shall be *indicted* and tried" as a principal. ORS 161.220. Defendant raised no objection to the indictment at the close of the state's case, by which time he certainly knew the "nature of the charge against him." See *State v. Steeves,* 29 Or 85, 88, 43 P 947 (1891), where defendant made a similar contention with timely objection. Therefore, we will not consider his objection for the first time on appeal, although the law in Oregon seems settled that a single person named as principal in an indictment may be convicted upon proof that he aided or abetted in the crime. *See,* for example, *State v. Glenn,* 233 Or 566, 379 P2d 550 (1963).

■ Defendant contends that several errors, perhaps each not prejudicial in itself, accumulated in this case so that their total effect was prejudicial and that together they dictate reversal. See *State v. Amory,* 1 Or App 496, 464 P2d 714 (1970). We have reviewed with care the voluminous transcript (some 2200 pages) of this lengthy trial. The evidence of defendant's guilt, aside from any challenged evidence, was overwhelming. Under these circumstances we think that the provisions of Oregon Constitution, Art VII, § 3 (amended) are applicable:

> "* * * If * * * after consideration of all the matters * * * the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error * * *."

See discussion, *State of Oregon v. Cahill,* 208 Or 538, 575-582, 293 P2d 169, 298 P2d 214, *cert denied* 352 US 895, 77 S Ct 132, 1 L Ed 2d 87 (1956); and *State v. Braley,* 224 Or 1, 355 P2d 467 (1960); *State v. Zadina,*

1 Or App 11, 14, 457 P2d 670 (1969); see also ORS 138.230.

Affirmed.

FORT, J., specially concurring.

The court's opinion in this case states:

"* * * We think the evidence supports the conclusion that the conspiracy had ended at the time Wright made the challenged statements."

I wish to note that while I otherwise concur in the reasoning and the result in this case, I do not find it necessary to hold that under the facts the conspiracy had come to an end at the time Wright made his statements, and therefore would not reach that question.

Schwab, C. J., joins in this specially concurring opinion.