Argued 7 July; decided 28 July, 1902.

## STATE v. WARREN.

[69 Pac. 679.]

MOTION TO DIRECT A VERDICT FOR DEFENDANT.

1. Under the established rule in Oregon, that to justify a direction to find for the defendant there must be a total failure of proof, or it must be so weak that a verdict based upon it would manifestly be unsupported, the motion in this case was properly overruled.

NAMES OF WITNESSES ON INFORMATION—STATUTES.

2. Under Laws, 1899, pp. 100, 101, § 5, providing that the name of each witness examined by a district attorney in support of any information shall be inserted at the foot of such information or indorsed thereon before it is filed, the examination of witnesses before a coroner's jury at an inquest, touching the cause of the death, is not such an examination in support of an information as will require the names of such witnesses to be indorsed on the information as a prerequisite to the right to introduce such witnesses at the trial.

BIAS OF WITNESS—CROSS AND REDIRECT EXAMINATIONS.

3. Where the defense on cross-examination of one of the state's witnesses, elicited the fact that such witness had had a fight with defendant, it was competent on redirect examination of such witness to show the cause of the fight, as bearing upon the bias of the witness.

EXPERT TESTIMONY—ORDER OF HEARING WITNESSES.

4. Where deceased was found in his room, having evidently been killed by assault, and it appeared that defendant left such room early the night before, testimony of an expert as to how long it would take blood to clot in the manner of clotted blood found in the room was admissible as tending to show how long the crime had been committed when discovered; and where such evidence was offered in chief and erroneously excluded, admitting it in rebuttal, with permission to defendant to produce evidence to meet it, and allowing it to go to the jury as a part of the state's case in chief, was not an abuse of the court's discretion.

WITNESS—TESTIMONY WITH AND WITHOUT MEMORANDUM.

5. Where a witness testified in chief independently of any memorandum, the fact that on cross-examination he testified as to other matters exclusively from a memorandum which also related to the subject of his testimony in chief was not ground for taking his testimony in chief from the jury.

Competency of Testimony Eliminating Other Possibilities.

6. On a prosecution for murder committed on board a ship, evidence as to the whereabouts of the various members of the crew on the night of the crime was admissible, as tending to increase the probability that defendant, who was the last person with deceased, committed the crime.

From Multnomah: Melvin C. George, Judge.

The defendant James L. Warren was convicted of murder in the second degree upon an information charging him with murder in the first, and appeals from a judgment of life imprisonment. On the morning of January 24, 1900, shortly after 9 o'clock, William Kirk, the mate of the ship Clarence S. Bement, was found in his room, situated on the port side of the ship, with a contusion upon the left side of his head, and his skull fractured. The wound had been produced by some heavy instrument having a slight projection or flange on the end, making a T-shaped external cut or laceration, extending through the skull, and the left eyeball being dislodged from its socket. When found he was in his berth, occupying the end of the room opposite the door, lying on his back, with the covering drawn over his breast. His face and beard were covered and matted with blood, and blood was found upon garments which had apparently been used for staunching the flow, and upon the wall about two feet above a lounge setting against it at right angles to the berth, and upon the lounge, where there was a clot or coagulum in a depression about eight by two and a half to three inches and an inch in depth, of such consistency that it could be lifted with the hands, and elsewhere about the room. The mate was in a semiconscious state, but showed some indications of intelligence. When irritated or aroused he would say, "Go away," "I don't want you," or something of that nature; and when being removed from his berth he requested that his trousers, which had not been removed, be secured, and, when placed in the patrol wagon, inquired where they were taking him. There were some indications that the blow had been struck while he was sitting on the lounge, as blood was spattered upon the wall about the height of a man's head while sitting; and in the opinion of Dr. Wheeler, who

first attended him, he was unable thereafter to get into his berth or bunk of his own volition. He was taken to the hospital, and died at 8:30 o'clock in the evening. The defendant was an old acquaintance of the deceased, of ten years' standing, and evidently knew when the ship was due, as he was at the wharf on her arrival, Friday, January 19th. He met the mate at once when he came off, and from that time until last seen together their relations were cordial and intimate.

John J. Byrne, an important witness in the case for the prosecution, testified, among other things, that he was employed as a night watchman on the ship, and went aboard shortly before 6 o'clock Saturday evening, when he saw the mate and Warren and three sailors, Erickson, Olsen, and a little fellow called Antone; that the mate and Warren were in the mate's room when he reported for duty; that they went ashore later, and came back about 12 o'clock, both occupying the mate's room the remainder of the night; that on Sunday evening, about a quarter of 6 o'clock, when he reported to the mate, Warren was in the room with him; that they seemed to be having a sociable time; had a box of cigars, a bottle of whisky, and glasses on the desk or table beside them; that the mate said he was going to the theater, and he and Warren went off the boat about half past 7 o'clock, but returned again at 12, both apparently sober; that they chatted in the mate's room until probably 2 o'clock in the morning, when the lights were turned down; that he called the mate the next morning, and received an answer, before going off the ship; that he went aboard Monday evening again at the usual hour; saw the mate in his room, and Warren in the forecastle, drying his clothing, he having had some difficulty with the men on board; that later he went aft to the mate's room, and in a few minutes went ashore, and did not return again that night; that on Tuesday evening, when he went aboard, at 6 o'clock, or a little before, he reported to the mate in his room, and found both him and Warren there; that they seemed to be having a sociable time; had cigars, whisky, and glasses on the sideboard, as usual; that the sailors were in the forecastle, getting ready to

go ashore, and the second mate and carpenter were also on board; that these latter went ashore about 7, but before going the carpenter stepped into the mate's room, and, when he returned, exhibited some money which the mate had given him; that the second mate previously told the deceased that he would send down a bottle of whisky, and a little later one of the men (either Erickson or Olsen, probably Olsen) met witness on the gang plank and handed him a bottle, which he took to the mate's room, and found both Warren and the mate inside; that at the time there was no one on board except the mate, Warren, and witness; that Olsen, Erickson, and Antone had gone ashore; that, after passing the bottle in, witness went forward on the starboard side, but subsequently passed around to the other side of the deck, when Warren came and crossed over, and, upon meeting him, inquired if he had brought the Evening Telegram, and, on being informed that he had not, replied, "Never mind," and went to the cabin. This was about half past 7; that witness stood on the hatch for a while, looking towards shore; that about 8 o'clock Warren came forward and met him on the deck; that Erickson had returned to the ship in the meantime, and had gone to the forecastle to get some money, and witness was watching to see him come down from there, and, as he met witness, Warren walked up on the other side, Erickson stepping ashore as Warren approached, who said the old man had gone to sleep, and he was going ashore a little ways, but that he would be back in a little while,—a few minutes,—and went ashore, and that witness did not see him again that night; that, after Warren left, witness went about his duties as night watchman; that about 10 o'clock he came down from the aft deck, and thought he heard some one moving in the mate's room, and looked or glanced through one of the two portholes opening into the room nearest amidship, and saw the mate with his back to witness (the upper part of his body), resting his left hand on a desk, and leaning over as if reaching down to adjust the stove (a coal oil lamp used for heating the room, setting on the floor), or for something else lower down; that the portholes were above the

lounge, looking forward on shipboard, and at the time were partly open,—nearly halfway ; that about 11 o'clock witness passed back by the room again, being attracted by the mate's ''groaning rather heavily,'' it being a habit of his to groan in his sleep ; that he looked through the porthole and saw the mate lying on the lounge,—his left foot,—but could not say whether he had his shoes on or not,—if not, he had on black stockings,—and that he had his trousers on; that witness passed around to his door and knocked, and, receiving no answer, knocked again, when he groaned out something like ''Who's there?'' that witness told him, and inquired if anything was the matter, and he groaned again ''No,'' or ''All right,''—something like that; then witness asked if he could get him a cup of coffee, and he said something in a muffled tone,—''Never mind;'' ''It will be all right;'' something like that; that when he was asleep he always woke up that way; that about 10 o'clock a Frenchman called Lhosten John came aboard, and went into the forecastle; that others of the sailors came aboard about midnight, who went to the forecastle also; that before leaving the ship on Wednesday morning, about 6, the witness helped the second mate and the carpenter aboard, who had been drinking heavily; that before going off he rapped on the mate's door, having had to rap the third time, and finally received a response, ''All right;'' that that was all he said any morning, except the first, when he asked witness if he had aroused the boys.

The second mate, in the presence of Rosenstine and Wolfe, his half-brother, opened the door with a key he had on his person, and found the mate at the time and in the condition above described. There was other evidence adduced to show that the mate had appointed Warren boatswain on Monday; that he served for a while, when he had trouble with the men, and the mate relieved him from duty for a time, until they became reconciled; that Warren had very little, if any, money; that on the next morning after he left the boat he purchased a first-class ticket to San Francisco, paying $25 therefor, and departed for that place on the overland at 8 o'clock; that he saw

an account of the murder in the San Francisco papers, and was asked about it by a ship's captain to whom he applied for a position; that he then borrowed $60 of his cousin, and purchased a ticket to St. Louis; that he was arrested in June following in Atlanta, Georgia, and at the time was going under the assumed name of J. L. Wilford, and, when brought to Portland and questioned by the chief of police, stated that he left the ship about 8:30 Tuesday evening, but declined to state where the mate was when he went off, saying that he would tell that at some other time; that he stopped in a lodging house that night, but refused to say where; and, when he was asked whether the mate was standing up or sitting down when he parted from him, answered, ''I will tell you that some other time.'' He stated further that the mate had a good deal of money; that the second mate, the carpenter, and the boatswain had all given him money; but refused to answer whether he (Warren) obtained any money after he left the ship; and admitted that he went under the name of Wilford in Atlanta, but explained that it was on account of some financial trouble he had in Seattle. It was further shown that he had knowledge of the ship's crew, including the mate, being paid off at the customhouse, and that some of the men intrusted their earnings to him for safe-keeping. The mate's watch was missing, and what money he had on his person. Two or three days later the sum of $400 was found where it was secreted by the mate, but it was made to appear that he had a much larger sum.                                              AFFIRMED.

For appellant there was a brief over the name of *St. Rayner & Clark,* with an oral argument by *Mr. Henry St. Rayner.*

For the state there was a brief over the names of *D. R. N. Blackburn,* Attorney-General, *Geo. E. Chamberlain,* District Attorney, *John Manning,* and *Arthur C. Spencer,* with an oral argument by *Mr. Blackburn,* and *Mr. Chamberlain.*

41 OR.— 23.

MR. JUSTICE WOLVERTON, after making the foregoing statement of the facts, delivered the opinion of the court.

1. This *resume* contains the chief features of the evidence going to connect the defendant with the commission of the crime charged. When the state rested, the defense moved the court to direct the jury to return a verdict of acquittal, and the denial of such motion constitutes one of the assignments of error. If there was evidence in the case fairly tending to show the defendant's guilt, it was properly submitted to the jury. To justify an instruction to acquit, there must be a total failure of proof, or it must be so weak that a verdict based upon it would manifestly be the result of passion, prejudice, or partiality: *State* v. *Pomeroy*, 30 Or. 16, 24 (46 Pac. 797) ; *State* v. *Couper*, 32 Or. 212 (49 Pac. 959) ; *State* v. *Glahn*, 97 Mo. 680 (11 S. W. 260). It is urged that the condition of the mate produced by the blow received at the hands of his assailant must have rendered him incapable of rising from the couch or reaching his bunk where he was subsequently found; and that he could not have answered the night watchman intelligently when called by him at 11 o'clock at night, and again in the morning at 6, and that therefore the deed could not have been committed until after the latter hour, at a time when it is not shown that the accused was upon the ship or in the vicinity. The theory of the state is that the assault was committed prior to 8 o'clock, Tuesday evening,—the hour when the accused was seen to leave the ship, as testified to by Byrne. This involved Byrne's testimony in some apparent discredit, because he testified that he saw the mate at 10 standing in a stooped position, and reaching down as if to adjust the lamp used for heating the room, and again, an hour later, reclining on the lounge; Dr. Wheeler being of the opinion that he could not have reached his berth without assistance. The fact is shown, however, that the mate was apparently not entirely without intelligence, because when being removed from the ship he gave a direction, and made inquiry, which unmistakably indicated as much, and when irritated or aroused he was able to make reply; so that it is possible, and not at all improbable,

that he was able to answer the night watchman, in the manner described, at 11, and again at 6 in the morning. It is possible that Byrne might have been mistaken about seeing the deceased standing in the room at 10, or upon the lounge later. He says he just glanced in at 10 o'clock, the light being turned halfway down or more; but at 11 he must have taken more pains to satisfy himself as to his condition, because after looking in at the porthole he passed around to the door, and succeeded in arousing him, and received an intelligent and satisfactory answer; and yet he may have been mistaken, also, as to seeing him on the lounge. And again, it is not beyond possibility that the mate had strength and intelligence enough left to have gotten into his berth and drawn the covering over him of his own volition. But these were all matters for the jury. There was an adequate motive shown for the deed, and the subsequent actions of the defendant were of such a character, when wholly unexplained, as they were, to lead to a strong distrust of him, so that there was evidence ample, under the theory adopted by the state, from which the jury might reasonably have inferred the defendant's connection with the crime, and hence his guilt in the commission thereof. The motion to direct a verdict was therefore properly denied.

2. Another ground of error assigned is that the court permitted the state to examine witnesses at the trial, against the accused, over his objection, whose names were not inserted at the foot of the information or indorsed thereon when filed. Preliminarily to the permission of such witnesses to testify, it was developed that the names of the only persons examined before the district attorney prior to filing the information were duly indorsed thereon; these being Erickson, Olsen, and McLauchlan. The district attorney, however, had learned what some of the witnesses would testify to through their examination before the coroner's jury, which was conducted on the part of the state by the deputy of his predecessor; and it is insisted that, having acquired such knowledge through this means, the names of all such witnesses should have been indorsed on the information; otherwise they should not have

been permitted to testify against the accused. The statute provides that the name of each witness examined on oath or affirmation by a district attorney in support of any information shall be inserted at the foot of such information or indorsed thereon before the same is filed; otherwise the testimony of such witness cannot be heard against the defendant at the trial: Laws, 1899, pp. 100, 101, § 5. This statute was enacted for a purpose, and that was evidently to afford the accused an opportunity of ascertaining the names of the witnesses with whom he would probably be confronted at the trial, and thereby be the better enabled to prepare for his defense. Such statutes are mandatory in character, and should be observed to the letter by the executive officers of the law, that the defendant may receive the full benefit designed for him by the legislature: *State* v. *Smith,* 33 Or. 483 (55 Pac. 534); *State* v. *Andrews,* 35 Or. 388, 391 (58 Pac. 765); *Stevens* v. *State,* 19 Neb. 647 (28 N. W. 304); *Parks* v. *State,* 20 Neb. 515 (31 N. W. 5); and *State* v. *Stevens,* 1 S. D. 480 (47 N. W. 546). We are of the opinion, however, that the examination of witnesses before a coroner's jury at an inquest, touching the cause of the death, is not such an examination in support of the information as is contemplated by the statute, and hence that the witnesses objected to were properly permitted to testify. We are inclined to give to the statute the broadest and most comprehensive application possible in furtherance of the statutory and constitutional right of the accused to a fair trial, and to enable him to prepare his defense intelligently, and to proceed therewith without any surprise being sprung upon him; and any practice tending to its restriction should be discountenanced.

3. On the cross-examination of Erickson, a witness for the state, the defense elicited the fact that witness and the defendant had a fight, in which the defendant's face was bruised; and on redirect examination witness was allowed to state, over the objection of the defendant, that the difficulty was started by the accused applying an opprobrious epithet to the witness; and the disregard of the objection is assigned as error. The

fact that a fight had occurred between the parties was elicited by the defendant on the cross-examination of the state's witness, which was pertinent and relevant in order to show the bias of the witness towards the defendant. The bare fact of a difficulty being thus established, it was not altogether irrelevant to show how it came about, as it had a bearing upon fixing the extent of the bias, and for which purpose alone it was admissible. As is said, in *Ellsworth* v. *Potter,* 41 Vt. 685, 689: "This testimony was not intended or calculated to show which party was in fault, but only the degree of estrangement between them. It is impractical by any general rule to fix the precise limit which should govern the admission of such evidence, and necessarily it must be left, to a considerable extent, to the discretion of the *nisi prius* court." The trial court was duly careful in guarding defendant's rights, and exercised a commendable discretion in the particular complained of, so that there was no error in allowing the state to show the origin of the estrangement, under the circumstances. See, also, *State* v. *Sargent,* 32 Me. 429, and *Beasley* v. *People,* 89 Ill. 571.

4. After the existence of the clot of blood upon the lounge had been established, the state sought to show by Dr. Wheeler the probable length of time necessary to acquire the consistency in which it was found, which the court refused to permit over the objection of the defendant. When the defendant came to offer his testimony he called Dr. Biersdorf, who testified that it takes from five to ten minutes for blood to form into a jellied condition; and then some further matter was elicited as to the length of time it would take for decomposition to set in. Dr. Wheeler, in his examination for the state, had described the clot as being in a jelly-like condition, and of such consistency that it could be lifted with the hands, and, being called in rebuttal, was permitted to testify, over objection, that, in his opinion, it would take from nine to twelve hours for blood to get in the condition in which it was found; and error is predicated on the ruling. The reason given for the objection was that the testimony sought to be introduced was touching a matter that should have been shown before the

state rested, but the court exercised its discretion and allowed it to go to the jury as a part of the state's case in chief, stating to the defendant at the time that he would have a reasonable opportunity to produce such evidence as he desired in rebuttal thereof. In our opinion, the testimony was properly admissible in the first instance, Dr. Wheeler being a competent expert in the premises (*State* v. *Magers,* 35 Or. 520, 538, 57 Pac. 197; *State* v. *Knight,* 43 Me. 11; *Linsday* v. *People,* 63 N. Y. 143, 158; *People* v. *Smith,* 106 Cal. 73, 39 Pac. 40); and the trial court exercised a proper discretion in permitting it to be given at that time, especially as it had been excluded when offered in its regular order upon the objection of the defendant. The further inquiry as to the time when decomposition would begin to take place was suitable in the development of the subject which the defense had introduced.

. 5. One Scott Morrill testified that he kept a place of business in Portland in January, 1900, and that on the 23d of the month there was no keno game running; the purpose being to contradict a witness produced by the defendant who gave testimony tending to show that the defendant had been lucky and won $10 or $12 at witness' place of business on the night of the homicide. On cross-examination it was elicited that the witness had a memorandum in which he kept an account of his winnings from night to night, and that none were shown for the night of the 23d, and, after a critical inquiry touching the memorandum, the defendant moved to strike out his testimony on the ground that he was speaking from the book, and not from his recollection. But the witness did speak from his recollection, either from being refreshed by an inspection of the book, or independently of it, when he was examined in chief, and the production of the book or memorandum was a matter called for by the defendant himself; and the fact that he spoke on cross-examination as to other matters exclusively from the memorandum constituted no valid reason for taking the evidence introduced by the state from the jury.

6. Another assignment of error goes to the introduction by the state of testimony tending to show the whereabouts of the

other members of the crew the night of the assault, with the purpose of diverting suspicion from them as perpetrators of the crime. The testimony was not intended to show an *alibi* as to the crew in particular, and thereby raise a collateral issue, but to show with greater emphasis the absence of persons other than the defendant on shipboard, whose place of abode was there, and thus increase the probability that defendant was the guilty party. The testimony was therefore admissible.

There are many assignments of error based upon instructions asked and refused, all of which we have examined with care, both with reference to the argument of counsel and authorities cited; and suffice it to say they are not attended with sufficient merit to require further discussion. All matters in controversy having been resolved in favor of the state, the judgment will be affirmed.          AFFIRMED.

---

Decided 3 May, 1902 ; rehearing denied.