Argued April 12, affirmed May 10, petition for rehearing denied June 13, 1961, certiorari denied U. S. Supreme Court May 28, 1962

# STATE OF OREGON v. McDONALD

361 P. 2d 1001

*William B. Murray,* Portland, argued the cause and filed briefs for the appellant.

*Oscar D. Howlett,* Deputy District Attorney, Portland, argued the cause for respondent. With him on

the brief was Charles E. Raymond, District Attorney, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

PERRY, J.

The defendant appeals from a conviction of purposely and maliciously using explosives with intent to injure the property of another.

The evidence in this case discloses that the defendant Levi McDonald was a member of the Stereotypers Union; that this union called a strike against the Oregonian Publishing Company, publisher of the Oregonian, a newspaper of wide general circulation in the city of Portland and the state of Oregon; that the Oregonian is printed in Portland, Oregon, and in order to distribute its newspaper to certain areas in the state the Oregonian Publishing Company entered into an agreement with the George McBreen Truck Company, a contract carrier, to transport its papers. The Publishing Company continued to publish its newspaper despite the strike of the Stereotypers Union and the defendant, who was a negotiator for the union, determined upon a course of harassment of the Publishing Company for the purpose of requiring the Company to suspend its publication, thus forcing it to accede to the union demands. One of his plans was to destroy the trucks which were used to distribute the newspapers. This plan led to the dynamiting of the trucks operated by the McBreen Truck Company and eventually to the defendant's indictment and conviction of the crime of using explosives with intent to injure property of another.

Defendant first contends that ORS 164.830, the statute which creates the offense and prescribes the penalty, is unconstitutional in three particulars:

1. "Under this statute the grand jury may indict, and the court may sentence one person for a felony and another person for a misdemeanor for the same prohibited act."

2. "The statute is so vague it fails to advise the accused of the nature of the charge. From its terms men of intelligence must necessarily differ as to whether the grand jury may indict, and the court may sentence in their unguided discretion either for a felony or a misdemeanor."

3. "The statute, ORS 164.830, is unconstitutional because the legislative assembly may not entrust nor delegate its legislative authority to the unguided discretion of the grand jury, nor to the judiciary, without first establishing fixed rules for the exercise of such discretion."

ORS 164.830 provides:

"Any person who purposely and maliciously and with intent to injure the person or property of another, sets off or explodes, or attempts to set off or explode, any bomb, dynamite, powder or other explosive, shall be punished upon conviction by imprisonment in the penitentiary for not more than 20 years, or by imprisonment in the county jail for not more than one year, or by a fine of not more than $500, or by both such fine and imprisonment."

Defendant's principal attack upon the statute seems to be based upon the misconception that the grand jury may determine whether or not a person charged under the act may be prosecuted for a misdemeanor or a felony, for he relies upon *State of Oregon v. Pirkey,* 203 Or 697, 281 P2d 698. The statute in question in *State of Oregon v. Pirkey* (Or Laws 1949, ch

129, § 1) provided that a person "* * * may be proceeded against either as for a misdemeanor or as for a felony, in the discretion of the grand jury or the magistrate to whom the complaint is made * * *," and it was held that such a statute, delegating to the grand jury or magistrate the right to determine in advance of conviction whether the crime committed was a felony or misdemeanor, violated the equal protection clause of the federal and state constitutions.

The statute under which the defendant was convicted makes no provision for a prior determination by the grand jury or examining magistrate as to whether a defendant shall be prosecuted for a felony or a misdemeanor. It only provides that the court in passing sentence may exercise its discretion as to the extent of the punishment to be imposed.

ORS 161.030 provides:

"(1) Crimes are divided into felonies and misdemeanors.

"(2) A felony is a crime which is punishable with death or by imprisonment in the penitentiary of this state. When a crime punishable by imprisonment in the penitentiary is also punishable by a fine or imprisonment in a county jail, in the discretion of the court, it shall be deemed a misdemeanor for all purposes, after a judgment imposing a punishment other than imprisonment in the penitentiary or in the Oregon State Correctional Institution.

"(3) Every crime not included in subsection (2) of this section is a misdemeanor."

■ This statute clearly points out that where the crime committed is punishable by "imprisonment in the penitentiary * * * [or] by a fine or imprisonment in a county jail," the crime committed is a felony for

all purposes until such time as a sentence has been imposed which does not commit the offender to the penitentiary or the Oregon State Correctional Institution. *State v. Steagall,* 214 Or 116, 328 P2d 142. It, therefore, follows that the grand jury or magistrate must treat all offenders against the act equally and indict or not indict each for a felony.

The fact that the legislature has granted discretion to the trial court to sentence one offender for a lesser or greater period of punishment does not make the act unconstitutional as denying equality of all persons before the law. *Howard v. Fleming,* 191 US 126, 24 S Ct 49, 48 L Ed 121.

We find the foregoing contentions of the defendant without merit.

The defendant assigns as error the refusal of the trial court to quash or dismiss the indictment or grant his motion for a directed verdict of acquittal, because the names of three witnesses were not endorsed on the indictment.

The record discloses the defendant was first indicted for the crime of which he was convicted February 13, 1960. The grand jury had heard three court reporters who were subpoened and gave testimony relative to confessions and admissions made by alleged accomplices of the defendant. Their names were endorsed on this indictment as witnesses. A motion to set aside this indictment was made by the defendant and before a ruling was had on this motion the State moved for dismissal of the indictment. This motion was granted and a new indictment was returned on February 24, 1960, by the same constituted grand jury which had considered the first indictment. The second indictment was the one upon which the defend-

ant was tried and convicted. None of the court reporters were subpoened or appeared and testified when the second indictment was returned. Their names were not endorsed upon the second indictment, nor were they called to testify in the trial of the case.

This identical question was before this court in *State v. Andrews,* 35 Or 388, 389-391, 58 P 765, and we stated:

"The transcript shows that the court sustained a demurrer to the first indictment charging the defendant with the commission of said offense, upon which were indorsed the names of twelve witnesses examined before the grand jury, and ordered the case resubmitted, whereupon the same grand jury returned the indictment involved in this appeal, indorsing thereon the names of two witnesses only. It is maintained by counsel for the state that when an indictment is set aside, and the case resubmitted to the grand jury, a subsequent indictment, found in pursuance of such resubmission, is a new proceeding entirely, and hence it is necessary to indorse thereon the names of the witnesses only who were examined after the resubmission. The statute requires that when an indictment is found the names of the witnesses examined before the grand jury must be inserted at the foot of the indictment, or indorsed thereon, before it is presented to the court; Hill's Ann. Laws, § 1260. And when the names of such witnesses are not so indorsed or inserted, the court must, upon motion of the defendant, if made at the proper time, set the indictment aside: Hill's Ann. Laws, § 1314; State v. Smith, 33 Or. 483 (55 Pac. 534). Whether the submission of the case to another grand jury after the indictment is set aside is a new proceeding in which the names of the witnesses examined before the former jury should be indorsed upon the indictment is a question the determination of which is not necessary to a decision of the case at bar. The case having been resubmitted to the same

grand jury, they must have retained in their memory the substance of the evidence theretofore given before them, and might possibly have found another indictment without calling a single witness. If this be true, it would necessarily follow, from the principle contended for by the state, that the indorsement of the names of witnesses upon the indictment might be entirely dispensed with, and the provision of the statute thus evaded. The manifest object of the requirement is to inform the defendant upon whose testimony the state chiefly relies for a conviction, so that he may know what evidence he may reasonably expect to be given against him. The statute, being designed to enable a person accused of the commission of a crime to prepare for his defense, should be liberally construed in his favor, and, this being so, the requirement to indorse upon the indictment, before it is presented to the court, the names of the witnesses examined before the grand jury is mandatory, and the court erred in refusing to set aside the indictment: State v. Pool, 20 Or. 150 (25 Pac. 375); Stevens v. State, 19 Neb. 647 (28 N.W. 304); Parks v. State, 20 Neb. 515 (31 N.W. 5); State v. Stevens, 1 S.D. 480 (47 N.W. 546)."

A re-examination of the statutes and the purposes underlying their enactment lead us to the conclusion that we were then in error.

ORS 132.580 provides:

"When an indictment is found, the names of the witnesses examined before the grand jury must be inserted at the foot of the indictment, or indorsed thereon, before it is presented to the court."

ORS 135.510 provides:

"The indictment shall be set aside by the court upon the motion of the defendant in either of the following cases:

"* * * * *

"(2) When the names of the witnesses examined before the grand jury are not inserted at the foot of the indictment or indorsed thereon."

■ There can be little question but that the purpose of the requirement of endorsement of the names upon the indictment at the time of presentment is for the purpose of advising the defendant of those persons who will give evidence in the trial against him so that he can intelligently prepare his defense and avoid surprise. *State v. Warren,* 41 Or 348, 69 P 679. This is a substantial right that is inherent in the American judicial conception of fair play, but the enforcement for failure to comply with this mandatory requirement rests in the rule that a witness who has appeared before the grand jury may not, if his name is not endorsed on the indictment, testify at the trial over the objection of a defendant. *State v. Warren,* supra; *People v. Koukol,* 262 Mich 529, 247 NW 738.

In reaching the conclusion in the case of *State v. Andrews,* supra, that all witnesses who appeared before the grand jury must be endorsed upon the indictment when presented, the court failed to take into consideration the requirement of ORS 132.320 (formerly § 26-506, OCLA) which provides:

"In the investigation of a charge for the purpose of indictment, the grand jury shall receive no other evidence than such as might be given on the trial of the person charged with the crime in question."

This enactment directs the grand jury in its deliberations to consider only such evidence presented before it as would be competent in the trial of the cause. It is well known that many persons may be called to testify before a grand jury and after their appearance

it is discovered through their examination that they are unable to give factual knowledge which would be competent in the trial of the cause.

■ When these statutes are considered together, it becomes clear the legislative intention was to require endorsement of the names of only those witnesses whom the grand jury believes can give competent evidence which will support a verdict of guilty and whose evidence it is expected will be used to confront the accused on the trial of the cause. It would only increase the burden for a defendant to be required to prepare his defense and avoid surprise if names are endorsed on the information whose testimony cannot be used in the trial of the accused. His rights are fully protected when he has been informed of the witnesses who will be called to testify against him.

It could not have been the legislative intent to require the doing of an act which would be without benefit to either the State or an accused. Therefore, it appears that the legislative intent was expressed to make the requirement of the statute—that "the names of the witnesses examined before the grand jury must be * * * indorsed thereon"—mandatory only as to those who gave competent evidence upon which an indictment could be returned and who could be used as witnesses in the trial of the cause. 4 Wharton's Criminal Law and Procedure 547, Indictment and Information § 1757.

It then becomes equally clear that the mandatory requirement of section (2) of ORS 135.510 refers to the failure to list the names of sufficient witnesses upon the indictment to support a verdict of guilty if found by a trial jury, not to the failure to endorse the name of some person who has appeared as a witness before

the grand jury. When there is a total failure of endorsement, or the failure to endorse a sufficient number of named persons to support a verdict of guilty if found (e.g., where corroboration is required to sustain a conviction), a presumption immediately arises that the grand jury has indicted from bias or mere caprice and not upon competent evidence as required by statute. Such a showing overcomes the presumption of regularity of the proceedings and the statute directs a dismissal of the indictment.

The defendant also assigns as error the refusal of the trial court to sustain his motion to quash the indictment upon which he was tried because the grand jury had heard hearsay evidence when the prior indictment was returned which it could not be expected to ignore, and, further, because of the publicity surrounding the matter, the grand jury could not act in an impartial manner.

■ The defendant construes ORS 132.320, which we heretofore quoted, in its strict literal sense. It should be remembered that a grand jury is an investigating and accusatory body consisting, not of lawyers and jurists, but of laymen who have no power to determine the guilt of an accused, and we cannot, therefore, believe it was the intention of the legislature to require that the grand jury should hear only such testimony as would be competent in a court of law. We doubt that there are many grand juries which have not been subjected to hearsay testimony during their investigations. This statute is admonitory in character only, not mandatory, advising the grand jury to disregard incompetent evidence in returning an indictment and to consider evidence only of such character that it may be used in the trial to support a conviction of the accused.

Since the function of a grand jury is investigatory and accusatory, an examination of the questions raised by the defendant reveals that the underlying question is the right of a trial court to examine into the deliberations of the grand jury and determine whether or not it heard and considered hearsay testimony or was prejudiced by the publicity surrounding the incidents and upon this basis returned the indictment.

ORS 132.390 provides:

"The grand jury ought to find an indictment when all the evidence before it, taken together, is such as in its judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury."

■ There can be no question that when an accusatory indictment is returned there is a presumption that the grand jury has acted in accordance with the admonition of this statute and ORS 132.320, supra. *State v. Belding*, 43 Or 95, 71 P 330. Since, as previously pointed out, this presumption is only overcome when there is a total failure to endorse the names of any witnesses upon the returned indictment, it must follow, under the well-settled rule in the majority of jurisdictions, including the state of Oregon, that the fact a grand jury may have been prejudiced by hearsay evidence or prejudicial publicity which it ought not to consider is not grounds for dismissing or quashing an indictment, for the trial court would then be required to inquire into and determine in advance of each trial the sufficiency of all of the evidence to sustain or reject an indictment, which it may not do. *State v. Kelliher*, 49 Or 77, 88 P 867; see Note, 59 ALR 573; 31 ALR 1479.

The defendant also assigns as error the failure of

the trial court to grant his motion for a change of venue and for a continuance.

The defendant admitted he was not prejudiced by the failure to grant a change of venue for the reason the publicity surrounding his indictment and arrest permeated the entire state, but he strenuously contends that this same publicity was so inflammatory and prejudicial that at the time he was required to go to trial an impartial jury could not be selected to grant him a fair and impartial trial.

■■ A trial court's ruling upon a motion for a continuance will be disturbed on appeal only for manifest abuse of its discretion. *State v. Payne*, 195 Or 624, 244 P2d 1025; *State v. Leland*, 190 Or 598, 227 P2d 785; *State v. Mizis*, 48 Or 165, 85 P 611, 86 P 361; *State v. Hawkins*, 18 Or 476, 23 P 475. And this rule applies where the postponement is asked, as here, for the purpose of a "cooling-off period on the part of the public mind." *State v. Sack*, 210 Or 552, 575, 300 P2d 427.

The defendant bases his principal contention upon the fact the newspapers were permitted to publish, prior to the defendant's trial, detailed confessions made by alleged accomplices of the defendant as to their own and defendant's participation in the bombing of the trucks, and, therefore, these stories must have inflamed the public mind against him. Also, "[t]he District Attorney waited until April 9th, approximately two weeks before the date set for defendant's trial on the newspaper truck bombing charge, to create further adverse public opinion against the defendant by causing him to be indicted for the stink bomb incident in a drug store. The statements Caryl Forbish was reported to have made to investigators and the District Attorney's office incriminating the defendant had been given great publicity which intensified the

general public hostility toward the defendant shortly before the present case was due to be heard."

The question of the effect of publicity upon the trial of an accused and how best to protect him from the prejudicial effects thereof has given the courts of this country much concern. See Controlling Press and Radio Influence on Trials, 63 Harvard Law Rev. 840 (1950). Slanted and exaggerated newspaper, radio and television reports of a defendant's activities, both before and subsequent to his accusation of a crime, undoubtedly, to some extent, adversely effect an accused in his defense. The full extent of this effect is for the time being a matter of conjecture. There is at this time no provision of law to subject each judge and juror to a psychological examination. The Judge and prospective jurors are all human beings, subject to all of the frailties of human nature, but until such time as a more exact method of determining the psychological effect of such prior reports and the length of time that must elapse before the average human being's reaction thereto is completely deadened is discovered, the courts to a large extent in setting the time of trial must rely upon their own impressions of the existing situation.

■■ However, there is nothing in the record before us that indicates the prior newspaper, radio and television expose created a hostile atmosphere that carried over into the trial. The trial court permitted extensive examination of each prospective juror as to what he had read and heard concerning the case and as to the influence it might have upon him as a juror. We must presume, as did the trial court, that the answers of each juror were honestly given. Therefore, while pre-trial publicity prevents an idealistic approach to the trial of a person accused of a crime and is to be

deplored, it cannot be said in this case that the publicity was so inflammatory or so slanted that an honest and impartial jury could not be selected whereby the defendant could receive a fair and impartial trial at the time he was tried, or that the trial was not conducted in "an atmosphere of judicial calm." 14 Am Jur 853, Criminal Law § 130.

The defendant also contends that the trial court erred in permitting a witness, Caryl Roger Forbish, to testify that at the instigation of and with the aid of the defendant a stink bomb was set off in a drugstore in the Oregonian Building, because the owners of the drugstore were not in sympathy with the strike.

It is the contention of the defendant that this particular crime was not germane to the question of whether or not he was guilty of the crime with which he was charged in the indictment, thus violating, to his prejudice, the rule set forth in *State v. La Jesse,* 132 Or 401, 286 P 149; *State v. Ewing,* 174 Or 487, 149 P2d 765, and *State v. Jensen,* 70 Or 156, 140 P 740.

The record discloses that the witness Forbish had been well-acquainted with the defendant for several years; that on several occasions they discussed various means and methods of causing harm to the Oregonian Publishing Company, for the purpose of causing it to suspend publication of its newspaper. The witness testified as follows:

"Q All right. In early December, I will put it, do you recall McDonald discussing with you anything concerning making any—conducting any harassment of The Oregonian Publishing Company?

"A Not to The Oregonian itself.

"Q Well, in what regard?

"A Harassing the drugstore.

"MR. CARNEY: Now, your Honor, I object to that if this has to do with a matter which is a different offense than that charged in this indictment, and we object to this line.

"THE COURT: I have already ruled on it and I am overruling your objection and you may proceed.

"MR. CARNEY: May I have a continuing objection?

"THE COURT: Yes, you do.

"Q  (By Mr. Howlett) Will you relate, if you can, when and where and under what circumstances the Defendant McDonald conversed with you on that subject?

"A  Well, it was—oh, there were different occasions where it was discussed, but he didn't feel too friendly toward the people who ran that drugstore in The Oregonian Building.

"Q  What did he say specifically in that regard?

"A  Well, he wanted to do something to get even with them because he felt that they were siding with the strikebreakers, and, oh, eventually he talked about throwing some type of a liquid in there.

"Q  Did you have any discussion with him on other subjects in December?

"A  Yes.

"Q  What subjects?

"A  In December we discussed doing something to the trucks at Johnston Brothers Trucking Line which are contract carriers for the paper. We talked of doing something to put the trucks out of commission for a while.

"Q  Was anything specific discussed in that regard?

"A  Well, we talked of using ballbearings, metal filings, and things like that, using those in the

crankcases and in the mechanical system. Sugar and—possibly sugar or pyrene or something in the gas tanks just enough to halt them.

"Q And did he ever say for what reason?

"A Well, he believed that if the trucks were put out of commission, well, the papers wouldn't get out like they were supposed to and would possibly make the papers come around to the Union's side.

"Q Now, do you recall any specific conversation regarding the use of some type of acid or stink bomb in the ventilating system?

"MR. CARNEY: Now, your Honor, we make the same objection to this matter.

"THE COURT: You can have a continuing objection. You will be overruled. Your questions are leading, Mr. Howlett; now, I am going to have to sustain them on the question of leading in the form of your questions.

"Q (By Mr. Howlett) Do you recall any specific conversation about using anything with respect to harassing the employees in The Oregonian?

"A Yes.

"Q All right. Will you tell the jury about that?

"A At various times we discussed the idea of using hot water bottles with a tube on them. I don't exactly know what the dickens they would be called, but filling those hot water bottles with some type of liquid, really yet unknown, and then placing the tube into the ventilation duct on the outside of The Oregonian Building and letting that liquid run into the air-conditioning unit and go through the whole building.

"Q Did he discuss how he was going to hold this apparatus up?

"A We decided on using large suction cups with hooks on them which you could just hang the

hot water bottles on and they would be placed against the side of the building.

"Q Was there any investigation in this matter as to what you could use in this regard? ·

"A Not to any real great extent. At one time as a joke I suggested using skunk oil.

"Q Did anybody pursue that?

"A Well, Mr. McDonald suggested I call some of the laboratories and see whether it would be possible to get some.

"Q Did you?

"A I called some laboratories and there was one that I called, I can't remember the name of it, but they said that they did have skunk oil there and that they had it in quarts or gallon size; I have forgotten what the price was and everything on it.

"Q Well, what was the purpose of putting this in the ventilating system?

"A Well, that was something to make the employees inside the building sick so they couldn't carry on with their work and that would slow the paper down, too.

"* * * * *

"A Well, as I say, there was a discussion on using metal filings, ball bearings, and stuff, and we had a lot of discussion on how the dickens you would take—you'd have to have the stuff in a sack or something to get inside the fence, and there was a lot of discussion on how you would be able to get all that stuff in there, because you would have to have a car to carry an awful lot of it to take care of fifteen trucks, and we discussed ways of trying to get into the area. We figured on cutting a hole in the bottom of the fence and crawling in or maybe snapping the padlock on the gates and then substituting another padlock, but they were both turned down because there was too much work involved and too much time.

"Q  Was there ever any discussion concerning the need for additional help?

"A  Yes, because I felt that as McDonald and I talked about it, I believe he was looking to me to take care of the whole thing, and there just—it was too big an area for one man to cover. You couldn't—

"Q  Now, let me interrupt you and ask you this question: Did McDonald ever approach you, and if your answer is 'yes,' will you state when and where, concerning using force against strikebreakers?

"A  Well, when I was first—when we first talked about even using the hot water bottles—

"MR. CARNEY: Your Honor, I assume we have a continuing objection to these questions with respect to other matters, other than trucks, using force against strikebreakers and stink bombs and that sort of thing?

"THE COURT: I will give you a continuing objection to it all, that's correct, and I will overrule your objection. However, there may be a time when you should object and that I will sustain you. I don't know when that will be, so when you think that time arrives, you better object. If you don't, I will go ahead.

"Q  (By Mr. Howlett) All right, proceed.

"A  Well, when we first even started discussions on hot water bottles in the ventilating system, why, Mr. McDonald asked me if I felt like making some money and I said I'd like to and he said, 'Well, you may have to defend yourself.' And when I asked him what he meant, well, he didn't say, but I asked him would it be in defending myself against some person or persons, and he said, 'Yes.' And I told him, well, I didn't want to have anything to do with it, then, because I am not the type that goes around fighting people, and that's all there was on that."

Later the witness testified as follows:

"Q   Now, directing your attention to January 12th of 1960, did you have occasion to see the defendant, Levi McDonald?

"A   Yes, I did.

"Q   Will you state where you first saw him on that date?

"A   At his home.

"Q   And what took place? Did you have any conversation with him?

"A   Yes, we had been discussing the stink bomb in The Oregonian Building—

"MR. TANNER: That's repetitious.

"THE COURT: Let's get down to the facts. This has been all gone over already, Mr. Howlett.

"THE WITNESS: And at that time—

"THE COURT: Let's don't keep repeating all this. Let's get on with it.

"THE WITNESS: At that time he told me that he had the chemicals to use for the stink bomb in the garage of his home, which he did.

"Q   (By Mr. Howlett) All right. Did he show you any?

"A   Yes, he did.

"Q   What did he show you?

"A   There was a box out in the garage containing various bottles and a lot of excelsior padding more or less to protect them.

"Q   All right. What happened? What did you do? What did you talk about?

"A   Well, we had decided about using heavy balloons like the type the children play with and filling them with the liquid from the bottles and holding onto the neck of the balloon and tossing it into the drugstore. Then we went down to one of the department stores downtown, I don't remember

44

which one, and bought two heavy balloons and took them back to his house. We spent some time in the house using tap water, just hooking the neck of a balloon over the faucet just to spread out the balloon and to check it to see if it would hold weight and it seemed to work out all right. So in the early evening it was decided to test the balloons with the liquid in them and he went out—we got one balloon and one type of liquid, I don't know exactly what it was, and went out in the backyard next to his incinerator where he filled up the balloon and it held for a couple of seconds, then the bottom fell out of it. It was either too heavy or maybe the material ate through the balloon, I don't know which, and so he decided to try the other balloon. And we went back to the garage and he poured liquid from another jar into the other balloon and it burst on the garage floor. And he then took cleaning solvent, gasoline, water, and tried scrubbing the floor and trying to get all of that liquid outside where it would be in the air just to blow away, more or less.

"Q   All right. That night did you do anything in respect to acid or chemical substance?
"A   Yes.

"Q   What did you do?
"A   It was, oh, between about—I guess it was about 10:30 McDonald asked me, 'Well, do you want to go ahead and get it over with?' So I figured, all right, might as well.

"Q   Did he offer to pay you for this work?
"A   Yes, but there wasn't any sum—

"Q   Mentioned?
"A   —mentioned on it.

"Q   All right, go ahead. And what happened?
"A   And I went home and got an old green heavy jacket with a parka on it that I had had for a few months. I decided to wear that, it would be

good in a disguise, so-to-speak, and, of course, the weather was still kind of cool out because there was a little bit of snow left and everything. And I went back over to McDonald's where he handed me a pair of gloves and put the sack—I mean, put the jar in a sack just to hold onto it and we climbed into the car. Well, he took the jar out of the sack, unscrewed the lid, and then tightened it back up again. He said that would break the seal on the lid so it would open easier. And he also warned me not to get any of the stuff on my clothes because it would smell like the dickens. And so we went downtown and went around The Oregonian Building, either once or twice, I don't know exactly which, and then he stopped on the corner of 6th and Jefferson in the dark area and said, 'I will wait here for you.' So I put my glasses in the car and at the time I was wearing a moustache. And I went up to the drugstore and walked inside to go up into the area to see exactly how many people there were inside. And I walked over to the card counter for a couple of minutes and an elderly woman came over and asked me if there was anything I wanted and I said, 'No, I was just looking,' and I just went outside again to see if there were any police on the street. And it seemed like it was fairly quiet. So I opened the door from the outside and held it open with my foot and taking the jar out of the sack, I unscrewed the lid and rolled the jar so it would hit right at the landing on the top steps and spill the liquid. I had been advised by McDonald just to throw the jar against the wall so it would shatter, and I felt that wouldn't be much help because it was felt that somebody might be injured by flying glass or something, and that was bad. And as soon as I rolled the glass, I started to roll away, walk away, and I heard the sound of breaking glass and I found out later that it had rolled into a showcase and broken. But I went back over across the street on Jefferson and went down to the car again and we left and went over to McDonald's home."

46

■ No specific objection was made to the testimony relative to the defendant's actual participation in the crime relative to the throwing of the stink bomb. The reasoning sustaining the rule of a continuing objection is based upon the proposition that "when an objection has once been acted upon and overruled it need not be repeated to the same class of evidence since it may be *assumed* that the trial court will adhere to the ruling throughout the trial." The objection, however, has efficacy only when the adverse ruling was erroneous. *Noteboom v. Savin,* 213 Or 583, 589, 322 P2d 916, 326 P2d 772.

■ There is no doubt that all of the testimony sought to be suppressed was properly admitted by the trial court. While the witness testified the action of the defendant in causing the stink bomb to be placed in the drugstore was not to harass the Oregonian Publishing Company, but because "he didn't feel too friendly toward the people who ran that drugstore in the Oregonian Building," it is evident, when considered with the other testimony given, this particular act was a part of the overall design to make more effective the strike against the newspaper.

■ The record in this case clearly shows that to make effective the strike was the motive which led to the commission of the crime of which the defendant was convicted. Evidence which shows the commission of other or collateral crimes is always admissible if this other evidence tends "to show motive, design or purpose for the crime charged." *State v. Long,* 195 Or 81, 116, 244 P2d 1033. This rule of law was fully explored by Mr. Justice BRAND in *State v. Long,* supra, and fully controls under the facts in this case so that the exclusionary rule relied upon by defendant does not

apply. See also *State v. Estabrook,* 162 Or 476, 91 P2d 838; *State v. Gillis,* 154 Or 232, 59 P2d 679.

The defendant sets forth other assignments of error which we have carefully examined and find so lacking in merit we deem it unnecessary to discuss them herein.

Finding that the defendant received a fair and impartial trial in which no error was committed, the judgment is affirmed.